LINKS: 86, 88, 94, 98, 107





# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| IN RE WET SEAL, INC. SECURITIES LITIGATION | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Case No. CV 04-7159 GAF (CTx)**<br><br>**ORDER REGARDING DEFENDANTS' MOTIONS TO DISMISS AND PLAINTIFFS' MOTION TO STRIKE EXHIBITS AND PORTIONS OF DEFENDANTS' MOTIONS** |

## I.

## INTRODUCTION

Wet Seal, Inc. ("Wet Seal") is a specialty retailer that sells clothing to young women, specifically teenagers.  For some period of time, Wet Seal managed successfully to navigate the choppy seas of this marketplace.  By mid-2002, however, it started losing money, and by early 2003 its overall same store sales were declining. Indeed, Wet Seal's stock price dropped by almost 75% by the **beginning date** of the class period in this case.  The continuing declines, the potential risks associated with those declines and with the fundamentals of its business, and the vagaries of its

149

1   marketplace were regularly disclosed in its 10-Q and 10-K filings with the SEC from

2   mid-2002 through late 2004.  The record before this Court clearly describes a

3   company that, by late 2003, could best be described as a "turn around" candidate and

4   that would properly have been characterized as a speculative investment.

5        In 2003, as its difficulties mounted, Wet Seal made changes in its

6   management and hired a new designer and, in the second half of the year,

7   implemented new initiatives to turn itself around.  A key element of the turnaround

8   was the development of a line of clothing for the 2004 back-to-school season, one of

9   two periods (the other being the Christmas season) that were critical to its overall

10  profitability.  While undergoing these turn around efforts, Wet Seal made a number of

11  statements regarding its current performance and its hopes of returning to profitability

12  after its new line was delivered to its retail stores.  In the end, however, the 2004

13  back-to-school line did not succeed, and the company took a $75 million charge

14  against revenues when it became clear that its cash flow would not be sufficient to

15  support the value of its long-lived and tax assets.  At about the same time that it took

16  the charge, Wet Seal announced that its new designer had left the company.  These

17  announcements caused Wet Seal's stock price, which had already suffered huge

18  declines over the prior two years, to suffer sizeable further declines.

19       Shortly after the announcement of the charge, the first of several cases in this

20  putative class action were filed in this Court, bringing securities-fraud claims against

21  Wet Seal and certain of its current and former officers and directors, as well as

22  against former Wet Seal shareholder La Senza Corporation ("La Senza") and two of

23  its officers, who were also Wet Seal directors during the Class Period.  The

24  complaints were later consolidated, and in September 2005, the Court granted all

25  Defendants' motions to dismiss the Consolidated Amended Complaint ("CAC") with

26  leave to amend.  The Court found that the CAC failed to satisfy the particularity

27  requirements of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §

28  78u-4(b) ("PSLRA"), for claims under the Securities Exchange Act of 1934 ("the 1934

1   Act"), 15 U.S.C. §§ 78j(b), 78t(a), 78t-1(a), and Rule 10b-5 thereunder, 17 C.F.R. §

2   240.10b-5. The Court noted that the CACC failed to plead a sustainable theory as it

3   essentially attacked the inability of Defendants accurately to predict the failure of the

4   2004 back-to-school clothing line. (Hearing Tr. at 7.)

5          The theory, and the support for it, have not been strengthened adequately in

6   Lead Plaintiffs' "First Amended Class Action Amended Complaint" ("FACC"). The

7   problem with the FACC, like the CAC, is that it is premised largely on the idea that

8   management and members of the board knew the new line would fail, which in turn

9   meant that they knew that Wet Seal would fail to recapture its customer base and to

10  generate sufficient cash flows to support its balance sheet. But Plaintiffs fail to plead

11  the concrete facts that support their premise – they do not explain the precise

12  information, known to Defendants but not the investing public, that indicated the 2004

13  line would fail. The omission of such facts from the FACC is fatal, because

14  Defendants repeatedly warned that, if the 2004 back-to-school line were not

15  successful, they might face charges to earnings or insolvency. These disclosures

16  mean Defendants' conduct was more consistent with their understanding of the

17  difficult financial condition of the company and their honest hope that their turn-

18  around efforts would succeed and thereby return Wet Seal to profitability.

19          Viewed in context, then, each aspect of the FACC is inadequate. To the

20  extent that the FACC asserts that Defendants committed fraud by violating Generally

21  Accepted Accounting Principles ("GAAP") as a result of alleged delays in writing off

22  the value of certain assets, Plaintiffs have not pled facts to show *why* the charge was

23  untimely, and therefore cannot show that financial statements submitted prior to the

24  charge were false or misleading. The decision to take the charge turned largely on

25  the question of whether the "long-lived assets" and the "tax assets" of the company

26  *could be supported by future cash flows*, which Defendants hoped would increase

27  with the introduction of the 2004 back-to-school line. The FACC, like the CAC, leads

28  largely to the inference that management believed in its turnaround strategy until

1   ***actual sales figures*** indicated the 2004 back-to-school line would not catch on, at

2   which point Wet Seal properly took the charge against assets.  Moreover, to the

3   extent Plaintiffs point to other statements of optimism, they fail to allege facts showing

4   that these statements were in fact false and known to be so, and they ignore

5   contemporaneous cautionary statements contained in press releases and quarterly

6   filings with the SEC.  Instead, Plaintiffs present conclusory allegations of intra-

7   corporate strife, many of which fail to include adequate corroborating details to satisfy

8   the heightened pleading standard of the PSLRA, and many of which focus on facts

9   that were disclosed to the public.  Similarly, the lack of corroborating details defeats

10  the claims that certain Defendants traded on material non-public information -- in

11  short, Plaintiffs fail to explain just what that information was.

12          To summarize, the FACC does not meet the heightened pleading

13  requirements of the PSLRA.  It fails to plead, with the requisite particularity, that the

14  named Defendants made knowingly false statements about any material matter either

15  directly or by violating GAAP (Section 10(b) and Rule 10b-5), that they controlled

16  someone who violated these provisions (Section 20(a)), or that the La Senza

17  Defendants traded on material nonpublic information (Section 20A).  Accordingly,

18  Defendants' motions to dismiss the FACC are **GRANTED WITHOUT LEAVE TO**

19  **AMEND** as to all claims.

20                                            II.

21                             **STATEMENT OF FACTS**

22  A. OVERVIEW

23          This is a federal securities case purportedly brought on behalf of all persons

24  who purchased publicly traded securities of Wet Seal between November 20, 2003

25  and August 19, 2004 (the "Class Period").  (FACC ¶ 1.)  Wet Seal, certain of its

26  officers and directors, and, La Senza, a major shareholder, allegedly issued false and

27  misleading financial reports and statements during the Class Period.  (Id. ¶ 2.)  The

28  FACC sets forth three categories of allegedly false statements: (1) press releases

1    announcing financial results, including monthly and quarterly sales and revenue

2    information, and SEC filings, which allegedly contained financial information that

3    violated GAAP; (2) statements of optimism that Wet Seal's consistently diminishing

4    sales trends would be reversed if its 2004 back-to-school line were successful, and

5    that Defendants were confident about Wet Seal and the turnaround; and (3) allegedly

6    false statements by La Senza officers reassuring the public that it did not sell its Wet

7    Seal stock because of any material non-public information.

8    **B. THE TURNAROUND PLAN AND ALLEGED MOTIVE FOR FRAUD**

9             After enjoying considerable success through mid-2002, Wet Seal's business

10   had declined dramatically by the beginning of the Class Period. (Id. ¶¶ 25-31.) Wet

11   Seal's stock price fell from $37 per share in early 2002 to $10 per share in November

12   2003. (Historical Prices for Wet Seal (Ex. 28).)  Additionally, Plaintiffs contend that by

13   February 2003, eight months prior to the start of the Class Period, Wet Seal needed

14   to close at least 50 underperforming stores and to record, under GAAP, a loss for

15   tens of millions of dollars in impaired store assets.  Defendant Irving Teitelbaum, then

16   the CEO of Wet Seal and Chairman and CEO of La Senza, was allegedly informed of

17   the need to close these stores by a "director level" employee in Wet Seal's real estate

18   department, which monitored store profitability.  In addition, by November 2003 Wet

19   Seal had experienced over 20 consecutive months and five consecutive quarters of

20   losses and still needed to close at least 50 stores. (FACC ¶ 2.)  Moreover, given a

21   cash shortage and a new credit line that was set to expire, Defendants needed to

22   extend Wet Seal's credit line and obtain additional cash. (Id.)

23            In the second half of 2003, though, Wet Seal began to implement a

24   turnaround program intended to return the company to profitability.  (2003 Form 10-K

25   at 3-5, 11-12 (Ex. 2).)  As part of its turnaround strategy, Wet Seal hired new

26   management; for instance, Peter Whitford was hired as President/CEO for Wet Seal

27   in June 2003, Allan Haims was brought in as President of the Wet Seal division in

28   August 2003, and Victor Alfaro, a famous fashion designer, was retained as Senior

1    Vice President/Creative Director for the Wet Seal division. (8/20/03 Press Release

2    (Ex. 6); FACC ¶ 29.)

3         The 2004 back-to-school line was the centerpiece of Wet Seal's turnaround

4    strategy, as Whitford stated that "[w]e look forward to introducing some promising new

5    merchandising strategies – the full effects of which are expected to materialize in our

6    back-to-school and fall lines." (FACC ¶ 44.)  Whitford also stated that Alfaro would

7    "develop a fresh new look for next year's [2004] spring and back-to-school" lines. (Id.)

8    **C. ALLEGED DECEPTION ABOUT WET SEAL'S PROGRESS AND THE BACK-TO-SCHOOL LINE**

9         In late 2003, Whitford represented that Wet Seal stores were "continuing to

10   gain ground . . . putting us on track to meet our sales estimates." (Id. ¶ 44(c).)  He

11   also indicated that Victor Alfaro "is an employee of Wet Seal.  His time is 100 percent

12   with Wet Seal." (Id. ¶ 44(f).)[1]  After previewing the back-to-school line in February

13   2004, Defendant Whitford stated that he believed the new designs were "fresh,"

14   "relevant," and "unique to Wet Seal." (Id. ¶ 44(g).)  In March 2004, Whitford stated

15   that Wet Seal was "on track to deliver improved financial performance in the fall, in

16   line with our turnaround plan." (Id. ¶ 44(c).)

17        However, Plaintiffs contend that the 2004 back-to-school line, which Plaintiffs

18   characterize as disastrous, contradicted Wet Seal's public assurances about its

19   turnaround plan. (Id. ¶¶ 44-51.)  Infighting between Haims and Alfaro and prolonged

20   absences by Alfaro allegedly caused Wet Seal to resurrect an old and failed line of

21   clothing from Zutopia – a division of Wet Seal geared towards a younger age group –

22   for its 2004 back-to-school line.  Moreover, although Wet Seal previewed its

23   back-to-school line for analysts on June 8, 2004 and received at least some positive

24

25   [1] Plaintiffs allege this was a misrepresentation, but the FACC also alleges that it was in direct
26   response to a question about whether Alfaro worked for another design company  (FACC ¶
     44(f) )  In context, the "100 percent with Wet Seal" comment was not a statement concerning
27   the sheer hours Alfaro spent with Wet Seal and thus was not a representation concerning
     absences from work due to disagreements with Haims or anyone else.  Therefore, because
28   Plaintiffs have not alleged that Alfaro in fact worked for another firm, they have not pled facts
     to show that this statement was a misrepresentation at all.

1    feedback (Exs. 18, 19, 20, 21, 22), Wet Seal ordered only 65% of the inventory it

2    needed to meet its projected sales for the back-to-school line, in purported

3    acknowledgment that the line would not be a success.  (FACC ¶¶ 45(d), 45-51.)

4         Moreover, because Wet Seal purchased half of the line on the open market, in

5    addition to using Zutopia's designs, Plaintiffs allege that the line lacked a cohesive

6    look.  Therefore, Plaintiffs contend that the back-to-school line "flopped" and its failure

7    was confirmed by Defendants, who no later than June 2004 sold off portions of its line

8    to "jobbers," a term for merchants who buy overruns from retailers and then sell them

9    at discounted prices.  (Id. ¶¶ 45, 53-54.)

10        Nonetheless, purportedly in support of an illusion that Wet Seal was

11   progressing towards a successful turnaround and in the course of reporting false

12   financial results in violation of GAAP, Defendants made comments such as

13   Defendant Whitford's June 8, 2004, statement that "I am pleased to report that we are

14   on plan to achieve that turnaround."  (Id. ¶ 44(k).)  In addition, Douglas Felderman,

15   who became CFO in April 2004, and Whitford signed Wet Seal's June 10, 2004 Form

16   10-Q that again failed to reflect the allegedly necessary writedown of Wet Seal's

17   impaired assets.  Plaintiffs argue that by reporting the allegedly required impairment

18   charges, Defendants would have created formidable obstacles to securing the new

19   credit line and a potential equity investment to raise the cash Wet Seal needed.  (Id.

20   ¶¶ 3, 36-41.)  Therefore, Defendants allegedly worked to "maintain[] the illusion" of a

21   turnaround, of which the 2004 back-to-school line was the centerpiece, until after Wet

22   Seal secured a new credit line and additional cash from equity sales, and until after

23   shareholder La Senza sold 100% of its Wet Seal shares.  (Id. ¶¶ 4-5, 24.)

24        According to Plaintiffs, the scheme succeeded.  In part based on the allegedly

25   inflated asset valuation, Wet Seal secured a $50 million credit facility on June 1,

26   2004, which replaced a previous credit facility that was due to expire at the end of that

27   month.  (Id. ¶¶ 34, 65-74.)  On June 30, 2004, Wet Seal also concluded a private

28   equity placement netting $27.2 million.  (Id. ¶¶ 74.)

## D. INSIDER SALES

Allegedly continuing with the fraud, on July 7, 2004 Haims claimed that positive reaction to the back-to-school line had him "highly confident" about the upcoming season. (Id. ¶ 55(l).) Moreover, in a press release the next day, Whitford stated that "[w]e remain confident that the new assortment . . . will deliver a better operating performance in the second half of the year." (Id. ¶ 44(m).) Based on those allegedly false statements, analysts upgraded their ratings of Wet Seal. (Id. ¶ 46.)

Plaintiffs allege that while possessing material, nonpublic information, such as (1) the need to close 50 underperforming stores (id. ¶ 26), (2) the fact that the Alfaro back-to-school line was simply an assemblage of Zutopia and open-market designs, (id. ¶ 50), (3) the fact that portions of the line had "flopped" and already been sold to jobbers in June 2004, (id. ¶ 54), and (4) adverse daily sales reports (id. ¶ 80), Teitelbaum and Gross, Secretary of Wet Seal, worked to extricate La Senza – of which Teitelbaum and Gross were both also officers and directors – from Wet Seal by selling 100% of La Senza's 10% equity possession in Wet Seal. Indeed, La Senza sold its 3.1 million shares for proceeds of almost $15.8 million between July 13 and 19, 2004. (Id. ¶ 75.)

In the midst of La Senza's selloff, Teitelbaum allegedly lied to the market in saying that the sales were "not a vote of no confidence" in Wet Seal, and La Senza's CEO Anna Palestini claimed that La Senza decided to sell its Wet Seal shares because "Wet Seal is not part of our strategy," because La Senza was working to become a "pure-play" lingerie retailer and Wet Seal was not a lingerie marketer. (Id. ¶ 83.) Plaintiffs maintain that these statements were designed to hide La Senza's true motive to abandon Wet Seal before the announcement of material adverse news that would greatly diminish the trading price of Wet Seal common stock. They also allege that La Senza had previously represented that it had already become a "pure play" lingerie retailer, which suggested that its ownership interest in Wet Seal was not

1    inconsistent with that posture, and also that it continued to hold assets in other

2    businesses that were "far removed" from women's apparel. (Id. ¶¶ 78, 82.)

3    **E. THE ADVERSE DISCLOSURES**

4         On August 5, 2004, Wet Seal disclosed its poor sales performance for the four

5    weeks ending July 31, 2004, and Wet Seal's shares closed at $3.00 per share, a

6    one-day 30% drop. (Id. ¶ 57.) On August 9, 2004, Wet Seal disclosed that Alfaro

7    had left the company and the stock fell 28%. (Id. ¶¶ 58-59.) In six days, Wet Seal

8    shares lost 61% of their value on volume of 23 million shares. (Id. ¶ 59.) Also on

9    August 9, 2004, Haims, allegedly lying, said that "[w]e believe that our new Fall

10   merchandise is both fashion forward and unique and is receiving positive feedback

11   from our customers." (Id. ¶ 44(n).)

12        On August 19, 2004, Wet Seal announced to the market a net loss from

13   continuing operations of $3.20 per share for the quarter ending July 31, 2004. (Id. ¶

14   60.) Wet Seal explained the loss by stating that in light of disappointing sales results

15   in the initial back-to-school season and recent financial performance, "management

16   believes it is unlikely that the company will recover or realize the carrying value of

17   [certain long-lived] assets" and that "[a]s a result, the company ha[d] taken a non-cash

18   charge totaling $75.5 million." (Id.; 8/19/04 Press Release (Ex. 16).) Wet Seal's

19   shares then fell to $.85 per share on August 20, 2004. (FACC ¶ 6.) The same day,

20   the Orange County Register reported Defendant Whitford's statement that "[t]he

21   business has been in decline for such a long period of time that Wet Seal has lost its

22   customer base." (Id. ¶ 62.)

23        Plaintiffs' claims are founded on the idea that Wet Seal had lost – and knew it

24   had irretrievably lost – its customer base since the beginning of the Class Period, and

25   that its claims otherwise were merely a charade to shift some of the fallout to

26   unsuspecting investors. (Id.)

27   //

28   //

1                             **III.**

2                        **DISCUSSION**

3   **A. THE LEGAL STANDARD FOR AVERMENTS OF SECURITIES FRAUD**

4         Unlike most pleadings, the PSLRA imposes a heightened standard for claims

5   of securities fraud. <u>Fischer v. Vantive Corp (In re Vantive Corp. Secs. Litig.)</u>, 283

6   F.3d 1079, 1084-85 (9th Cir. 2002) ("<u>Vantive</u>"); 15 U.S.C. § 78u-4(b).  "The purpose

7   of this heightened pleading requirement was generally to eliminate abusive securities

8   litigation and particularly to put an end to the practice of pleading 'fraud by hindsight.'"

9   <u>Id.</u> (citation omitted).  The statute provides:

10        In any private action arising under this title . . . in which the plaintiff

11        alleges that the defendant –

12        (A) made an untrue statement of a material fact; or

13        (B) omitted to state a material fact necessary in order to make the

14        statements made, in the light of the circumstances in which they were

15        made, not misleading;

16        the complaint shall specify each statement alleged to have been

17        misleading, the reason or reasons why the statement is misleading, and,

18        if an allegation regarding the statement or omission is made on

19        information and belief, the complaint shall state with particularity all facts

20        on which that belief is formed.

21   15 U.S.C. § 78u-4(b)(1); <u>accord</u> <u>Vantive</u>, 283 F.3d at 1085, <u>In re Syncor Int'l Corp.</u>

22   <u>Secs. Litig.</u>, 327 F. Supp  2d 1149, 1156 (C.D. Cal. 2004).  Thus, specific false

23   statements must be pled with particularity.  This means that "a plaintiff must provide a

24   list of all relevant circumstances in ***great detail***."  <u>Janas v. McCracken (In re Silicon</u>

25   <u>Graphics Sec. Litig.)</u>, 183 F.3d 970, 984 (9th Cir. 1999) ("<u>Silicon Graphics</u>")

26   (emphasis added).

27         Further, the complaint must "state with particularity facts giving rise to a

28   ***strong*** inference that the defendant acted with the required state of mind." 15 U.S.C.

1    § 78u-4(b)(2) (emphasis added).  In other words, a complaint may properly be

2    rejected if it fails to "allege contemporaneous facts in sufficient detail and in a manner

3    that would create a strong inference that the alleged adverse facts were known at the

4    time of the challenged statements."  Vantive, 283 F.3d at 1085 (citing Ronconi v.

5    Larkin, 253 F.3d 423, 435 (9th Cir. 2001)); see also Sparling v. Daou (In re Daou

6    Sys.), 411 F.3d 1006, 1015 (9th Cir. 2005) ("Daou").

7            The requirement of a "strong" inference of scienter means that "the court must

8    consider *all* reasonable inferences to be drawn from the allegations, including

9    inferences unfavorable to the plaintiffs."  Gompper v. VISX, Inc., 298 F.3d 893, 897

10   (9th Cir. 2002) (emphasis in original); accord, e.g., Emplrs. Teamsters Local Nos. 175

11   & 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125, 1134 (9th Cir. 2004)

12   ("Clorox").  Indeed, the Supreme Court has recently emphasized that "[t]he strength of

13   an inference cannot be decided in a vacuum."  Tellabs, Inc. v. Makor Issues & Rights,

14   Ltd., 127 S. Ct. 2499, 2510 (2007).  Accordingly, under the PSLRA, "[a] complaint will

15   survive . . . only if a reasonable person would deem the inference of scienter cogent

16   and at least as compelling as any opposing inference one could draw from the facts

17   alleged." (Id.)

18           In addition, although the Court considers the allegations in the complaint "as a

19   whole" in assessing the required strong inference, Livid Holdings Ltd., 416 F.3d at

20   948; No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding

21   Corp., 320 F.3d 920, 932 (9th Cir. 2003) ("America West"); Nevius v. Read-Rite Corp.

22   (In re Read-Rite Corp. Secs. Litig.), 335 F.3d 843, 846 (9th Cir. 2003) ("Read-Rite"),

23   the Court must also analyze scienter separately for each alleged misrepresentation

24   and each defendant.  The two Circuit courts to address the issue and several courts

25   in the Ninth Circuit – including this Court in ruling on the previous motions to dismiss –

26   have accepted that prior case law allowing group pleading "did not survive the

27   PSLRA. As such, the individual defendants *cannot be liable for the false*

28   *statements found in the complaint on a group-pleading theory*."  Syncor, 327 F.

1  Supp. 2d at 1172 (emphasis added) (Baird, J.); accord Southland Sec. Corp. v.

2  INSpire Ins. Solutions Inc., 365 F.3d 353, 364-65 (5th Cir. 2004); Makor Issues &

3  Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 602-03 (7th Cir. 2006) (citing Southland); In

4  re Lockheed Martin Corp. Secs. Litig., 272 F. Supp. 2d 928, 936 (C.D. Cal. 2002)

5  (Pfaelzer, J.).

6          In addition, plaintiffs cannot allege "intent" in general terms or simply "motive

7  and opportunity" or "recklessness," but instead must "plead, at a minimum, particular

8  facts giving rise to a strong inference of *deliberate or conscious recklessness*."

9  Silicon Graphics, 183 F.3d at 979; Livid Holdings Ltd., 416 F.3d at 948. "Thus the

10  complaint must allege that the defendant made false or misleading statements either

11  intentionally or with deliberate recklessness or, if the challenged representation is a

12  forward looking statement, with "actual knowledge . . . that the statement was false or

13  misleading.'" Vantive, 283 F.3d at 1085 (citing 15 U.S.C. § 78u-5(c)(1)(B)(I))

14  (alteration in Vantive).

15  **B. PRELIMINARY CONSIDERATIONS: THE SCOPE OF THE RECORD**

16          **1. THE LEGAL STANDARD**

17          Defendants submit a variety of exhibits in support of their motions to dismiss,

18  and properly request that the Court take judicial notice of all of them.  As one court

19  has summarized the applicable standard:

20          In a motion to dismiss, a Court may take judicial notice of documents

21          attached to *or referenced* in the complaint without converting the

22          motion into one [for] summary judgment where the authenticity of the

23          documents are not in dispute. . . .  In addition, *the court may consider*

24          *public filings, including SEC filings*. . . .

25  Syncor, 327 F. Supp. 2d at 1156 (citations omitted, emphases added).  As well as

26  SEC filings, the Court may also take judicial notice of other matters of public record

27  such as press releases, analyst reports, news articles, and conference call transcripts

28  in cases such as this, where they are relied upon by the complaint.  See, e.g., In re

1   Copper Mountain Secs. Litig., 311 F. Supp. 2d 857, 863-64 (N.D. Cal. 2004) ("Copper

2   Mountain"); see also In re Homestore.com, Inc. Secs. Litig., 347 F. Supp. 2d 814, 817

3   (C.D. Cal. 2004) ("Homestore"); In re Guess?, Inc. Secs. Litig., 174 F. Supp. 2d 1067,

4   1068 (C.D. Cal. 2001) ("Guess?").

5          Such documents as analyst reports, however, may only be considered "when

6   they are submitted to establish 'whether and when certain information was provided to

7   the market,' not the truth of the matters asserted in the reports." See In re Infonet

8   Servs. Corp. Secs. Litig., 310 F. Supp. 2d 1106, 1116 (C.D. Cal. 2003) ("Infonet")

9   (quoting In re PETsMART, Inc. Secs. Litig., 61 F. Supp. 2d 982, 987 n.1 (D. Ariz.

10  1999) ("PETsMART")).  However, courts regularly accept that facts in such

11  documents may properly be considered substantively, where plaintiffs rely on the

12  same documents and they are central to the allegations of intent to defraud.  See

13  PETsMART, 61 F. Supp. 2d at 987 n.1; Infonet, 310 F. Supp. 2d at 1116.

14         In addition, on a motion to dismiss securities fraud claims, "the court may

15  consider the full text of the relevant documents to determine whether the plaintiffs

16  have alleged material misrepresentations or omissions," without converting the motion

17  to a motion for summary judgment. Infonet, 310 F. Supp. 2d at 1113 (citing In re Stac

18  Elecs. Secs. Litig., 89 F.3d 1399, 1405 n.4 (9th Cir. 1996) ("Stac Electronics")).  At

19  least where plaintiffs do not dispute the authenticity of certain reports, the Ninth

20  Circuit has reasoned:

21              As the district court pointed out, 'having raised questions about

22              [officers'] stock sales, based [her] allegations on [officers'] SEC filings,

23              and submitted expert declarations that rely on the SEC forms at issue,

24              [Brody] can hardly complain when [the officers] refer to the same

25              information in their defense.'

26  Silicon Graphics, 183 F.3d at 986; see also Infonet, 310 F. Supp. 2d at 1116 n.10.  In

27  the same vein:

28

> [D]ocuments crucial to the plaintiff's claims but not explicitly incorporated in a complaint can be noticed in order to prevent a plaintiff from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based.

Wietschner v. Monterey Pasta Co., 294 F. Supp. 2d 1102, 1109 (N.D. Cal. 2003) (citing Parrino v. FHP, Inc., 146 F.3d 699, 706 (9th Cir. 1998) (taking judicial notice of SEC forms and press releases that were "clearly, if indirectly, referenced in the Complaint as integral to the stock sale allegations made in the Complaint.").

### 2. PLAINTIFFS' MOTION TO STRIKE

Although Plaintiffs do not challenge most of Defendants' submissions, they move to strike certain exhibits and references in the briefs thereto, as follows:

– Exhibits 9 [Press Release], 18-22 [Analyst Reports], and 29 [SEC filing] to the Avrith Declaration;

– Exhibits A, B, G, M and T [La Senza Entities' Filings with Canadian Securities Administrators], D-F and S [Wet Seal SEC filings], and K-L [La Senza Press Releases] to the Longo Declaration; and

– Exhibit 9 [Newspaper article] to the Nagler Declation

Plaintiffs accuse Defendants of improperly referring to matters that are not incorporated into the FACC and therefore are not properly considered on a motion to dismiss. Plaintiffs request that if the Court chooses to consider these exhibits, that the motion be converted into one for summary judgment and Plaintiffs be allowed to take discovery pursuant to Fed. R. Civ. P. 56(f).

Plaintiffs' contentions lack merit. First, the Court may properly take judicial notice of the SEC filings as public records of undisputed authenticity. See, e.g., MGIC Indem. Corp. v. Weisman, 803 F.2d 500, 504 (9th Cir. 1986); see also In re Gupta Corp. Secs. Litig., 900 F. Supp. 1217, 1228 (N.D. Cal. 1994) ("Gupta Corp."); Plevy, 38 F. Supp. 2d at 821 (taking judicial notice of SEC filings, even those "not specifically mentioned" in the complaint).

1    Moreover, to the extent that Defendants submit documents that were filed

2  publicly pursuant to the laws of Canada, (see Longo Decl., Exs. A, B, G, & T), the

3  documents are analogous and judicially noticeable in the same manner as the SEC

4  documents.  In ruling on a motion to dismiss under the PSLRA, "the court may take

5  judicial notice of information that was publicly available to reasonable investors at the

6  time the defendant made the allegedly false statements." Copper Mountain, 311 F.

7  Supp. 2d at 864 (citation omitted).  Plaintiffs base their objection to the Canadian

8  filings on the Supreme Court's acceptance of "the general principle that foreign law is

9  to be proved as a fact." Black Diamond S.S. Corp. v. Robert Stewart & Sons, Ltd.,

10  336 U.S. 386, 397 (1949).  However, Defendants are not calling into question an

11  issue of foreign law, but are instead referring to publicly available documents, and

12  thus Plaintiffs' distinction between domestic and Canadian filings is unpersuasive.

13    Moreover, several of the documents that Plaintiffs challenge were referred to

14  *by Plaintiffs* in their FACC or opposing papers, or were submitted previously by

15  Defendants in support of their motions to dismiss the CAC and were not objected to.

16  (Ex. 9 [Press Release], Exs. 18-22 [Analyst Reports], Ex. 29 [SEC filing], & Exs. M, T

17  [La Senza filings].)  These documents are therefore properly subject to judicial notice

18  now for this additional reason. See, e.g., Copper Mountain, 311 F. Supp. 2d at 864

19  ("As it is a record in the court's own file, it is the proper subject of judicial notice.").

20  And even if objection to these documents had not been waived, Defendants submit

21  them for the availability of information to the market (such as with respect to the

22  quality of the back-to-school line), rather than for the truth of any matter.  These

23  documents are therefore likewise subject to judicial notice as matters of public record

24  and unquestioned authenticity.

25    Finally, with respect to press releases submitted as Exhibits K and L to the

26  Longo declaration, La Senza Defendants disagree with Plaintiffs' assertion that these

27  documents are "not referred to or relied upon in the FAC[C]" by noting the explicit

28  allegation that "[n]owhere in the 2003 annual report or in any other public statement

1  prior to La Senza's sale of its Wet Seal stock did La Senza, Teitelbaum or Gross

2  suggest that La Senza's investment in Wet Seal is inconsistent with La Senza's

3  long-term strategy." (FACC ¶ 82 (emphasis added).)  In essence, then, the FACC

4  refers to the universe of La Senza's public statements, of which Exhibits K and L are

5  a part. The Ninth Circuit has accepted that "if a plaintiff's claims are predicated upon

6  a document, the defendant may attach the document to his Rule 12(b)(6) motion,

7  even if the plaintiff's complaint does not explicitly refer to it." Parrino, 146 F.3d at 706

8  (emphasis added); see also Syncor, 327 F. Supp. 2d at 1156; Copper Mountain, 311

9  F. Supp. 2d at 864. This law is applicable here, and means the press releases are

10  properly part of the record.

11         For all these reasons, Defendants' requests for judicial notice are **GRANTED**,

12  and Plaintiffs' motion to strike is **DENIED**, as is the request to convert the motion into

13  one for summary judgment.

14  **C. CLAIMS AGAINST ALL DEFENDANTS PURSUANT TO SECTION 10(B) AND RULE 10B-5**

15         To state a violation of Section 10(b) and Rule 10b-5, see 15 U.S.C. § 78j(b),

16  17 C.F.R. § 240.10b-5, a plaintiff must allege: (1) a misrepresentation or omission; (2)

17  of material fact; (3) made with scienter; (4) upon which plaintiffs relied; (5) in

18  connection with the purchase or sale of securities; and (6) proximately resulting in

19  injury to the plaintiffs. "[A] fact is material if there is a substantial likelihood that a

20  reasonable investor would consider it important in his or her decision making." In re

21  Immune Response Secs. Litig., 375 F. Supp. 2d 983, 1020 (S.D. Cal. 2005) (quoting

22  America West, 320 F.3d at 934 (internal citations omitted)).

23         Here, Plaintiffs essentially claim three categories of misrepresentation give

24  rise to liability under Section 10(b) and Rule 10b-5.  First, they contend Wet Seal's

25  financial statements from November 20, 2003 to August 19, 2004 were rendered

26  misleading by improper accounting practices, and therefore that the statements

27  amounted to actionable misrepresentations attributable to Wet Seal and the officers

28  that signed the statements (Whitford, Deckop, Gross, Felderman, and

-16-

1   Teitelbaum).  Second, they claim Deckop, Haims, and Whitford ("the Officer

2   Defendants"), and therefore Wet Seal, made false statements about the success of

3   the turn-around plan, and specifically the success of the 2004 back-to-school line.

4   Third, Plaintiffs allege Teitelbaum and La Senza CFO Anna Palestini lied to the

5   market in their public explanations for La Senza's sale of its Wet Seal stock.  As

6   discussed below, however, Plaintiffs fail adequately to plead that any of these

7   purported misrepresentations were actionable.

8         1. PLAINTIFFS' GAAP ALLEGATIONS FAIL

9         The first category of purported misrepresentation arises from alleged

10   accounting improprieties, which Plaintiffs contend made Wet Seal's financial

11   statements materially false.  However, Plaintiffs fail adequately to allege the

12   accounting violations in the first instance, and even if they had, they fail adequately to

13   allege that the accounting practices were accompanied by the requisite scienter.

14         a. Plaintiffs Have Failed Adequately to Allege a Violation of GAAP

15         Plaintiffs correctly argue that GAAP violations can give rise to Section 10(b)

16   liability.  "Financial statements filed with the Commission which are not prepared in

17   accordance with generally accepted accounting principles will be presumed to be

18   misleading or inaccurate, despite footnote or other disclosures, unless the

19   Commission has otherwise provided."  17 C.F.R. § 210.4-01(a)(1); see also Miller v.

20   Pezzani (In re Worlds of Wonder Sec. Litig.), 35 F.3d 1407, 1418 (9th Cir. 1994)

21   ("WOW") ("[A] company that 'substantially overstates its revenues by reporting

22   consignment transactions as sales . . . makes false or misleading statements of

23   material fact.'" (citations omitted and alteration in original)).

24         Here, Plaintiffs point to the $75 million impairment charge that Wet Seal

25   eventually took on August 19, 2004, and contend GAAP required Wet Seal to take

26   that charge as early as November 1, 2003.  As a result of the delay, the FACC alleges

27   that Wet Seal's financial statements and announcements of quarterly results in the

28   period from November 20, 2003 to August 19, 2004 were false.  (Id. ¶ 35.)  Such

1   "false statements" – through signatures on Wet Seal filings – were allegedly made by

2   Defendants Whitford, Deckop, Felderman, Teitelbaum, and Gross (though not

3   Haims).  Indeed, this is the only kind of false statement attributed to Felderman and

4   Gross.

5          In support of the GAAP claims, Plaintiffs reiterate many allegations the Court

6   deemed insufficient in rejecting the CAC.[2]  They also add that (1) many of the stores

7   were "run down," and (2) Wet Seal needed to close 50 underperforming stores, but

8   refused to do so.  Plaintiffs make no attempt to elaborate on the allegation of "run

9   down" stores, and provide only slightly more detail as to the need to close stores.

10  They allege that a director-level employee in Wet Seal's real estate department,

11  which evaluated profitability of Wet Seal stores, told then-CEO Irving Teitelbaum in

12  February 2003, which was before the Class Period, that Wet Seal needed to close 50

13  underperforming stores, and explained how these stores were draining profitability.

14  (FACC ¶¶ 96-98.)  Ironically, Plaintiffs do not recount the reasons for the profitability

15  drain in the FACC; they merely allege that the real estate director told Teitelbaum the

16  reasons, but without specifying what those reasons were.  In any event, the

17  profitability drain was purportedly "confirmed" (though the FACC does not indicate to

18  whom) by a post-Class Period analysis that indicated approximately 90% of Wet

19  Seal's losses were attributed to 10%, or approximately 50, of Wet Seal's stores.  (Id.

20  ¶ 97.)

21

22  [2] As with the CAC, the FACC contends the following factors compelled taking the charge earlier:
    (1) Wet Seal had declines in sales, negative comparable store sales, and operating losses since
23  mid-July 2002; (2) Wet Seal had negative cash flow in 2003 and 1Q 2004; (3) Wet Seal was
    experiencing a tightening of credit; (4) as of January 31, 2004, Wet Seal's net lease
24  commitments were $433 million, (5) as of May 1, 2004, markdowns represented 46.6% of total
    retail sales, and (6) Wet Seal had lost its target teenager customer base.  (FACC ¶ 40 )  In
25  dismissing the CAC, the Court found that Plaintiffs failed to meet their burden of showing that
    Wet Seal should have taken the charges earlier than it did, reasoning that the impairment rules
26  at issue here depend on a company's judgment about future events – namely about when its
    future income cannot cover the carrying value of the assets  (See Hearing Tr. at 8.)  The Court
27  concluded that the most reasonable inference from the CAC was that Defendants' beliefs
    squared with their representations – that the 2004 back-to-school line could turn the company
28  around.  (See id )

-18-

1    But the FACC does not connect up the underperforming stores with the

2  alleged GAAP violation.  First, Plaintiffs simply contend that Statement of Financial

3  Accounting Standards ("SFAS") No. 144 required that Wet Seal determine whether its

4  long-lived assets were impaired, since indications of possible impairment existed.

5  (Pls.' Opp. to Wet Seal Mot. at 6; see SFAS No. 144; FACC ¶¶ 8, 37.)  Although

6  Plaintiffs are correct that SFAS No. 144, paragraph 8 describes the circumstances

7  when a long-lived asset should be *tested* for recoverability (Neville Decl., Ex. 7),[3] the

8  standard does not provide that the need to test equates to an obligation to write

9  down.  Moreover, citation to SFAS No. 144 does not further Plaintiffs' case because

10  the FACC includes no allegations that this testing was *not* done, and a 10-K indicates

11  that it *was* done.  (Ex. 2 at F-8.)   Thus, nothing in the discussion of SFAS No. 144

12  suggests that Wet Seal violated GAAP by waiting to August 2004 to write down

13  certain of its assets.

14    In short, whether or not GAPP requires that charges be taken under specified

15  circumstances, Plaintiffs have not established that those circumstances were present

16  prior to August 2004.  Thus, for example, although Plaintiffs allege Teitelbaum was

17  told of a need to close stores, they fail to include any underlying reasons for this

18  advice, without which they have not shown a GAAP violation.  Similarly, Plaintiffs fail

19  to allege any facts supporting the reliability of the post-Class Period report that

20  purportedly confirmed the existence of 50 underperforming stores – such as who

21  prepared it, the source of its information, or the stores to which it referred.  The

22  omission of these details renders essentially meaningless the allegation regarding the

23  existence of such a report.  See Silicon Graphics, 183 F.3d at 985 ("We would expect

24  that a proper complaint which purports to rely on the existence of internal reports

25

26

27

28

---

[3] "A long-lived asset . . . shall be tested for recoverability whenever events or changes in circumstances indicate that its carrying amount may not be recoverable " (Neville Decl., Ex. 7 [SFAS No. 144] ¶ 8.)

-19-

1    would contain at least some specifics from those reports as well as such facts as may

2    indicate their reliability.").

3         Equally unavailing is Plaintiffs' contention that given Wet Seal's cumulative

4    losses, GAAP required that a loss reserve be recorded for deferred tax assets.  They

5    cite to SFAS No. 109, "Accounting for Income Taxes," which provides that "[f]orming a

6    conclusion that a valuation allowance is not needed *is difficult* if there is negative

7    evidence such as cumulative losses in recent years."  (Nagler Decl., Ex. 8 [SFAS No.

8    109] (emphasis added); see Pls.' Opp. to Wet Seal Mot. at 6; FACC ¶¶ 38-41.)

9    However, this does not mean that an earlier recording was *required*, and Plaintiffs do

10   not allege any facts showing that the conclusion or testing was improperly made or

11   done.  Because SFAS No. 144 also notes that "significant judgment is required in

12   developing estimates of future cash flows" to test a long-lived asset for recoverability

13   (SFAS No. 144, ¶ B19; see also id. ¶ B22), that Wet Seal cash flow estimates proved

14   in hindsight to be too optimistic does not mean that the failure to take an impairment

15   charge earlier was a violation of GAAP.

16        Further, the FACC contains no facts showing that Wet Seal's estimates of

17   income from the assets in question – i.e., the underperforming stores – were less

18   than their carrying value, or that Wet Seal's estimates were unfounded.  Plaintiffs

19   attempt to cure this defect by pointing to allegations that "by November 2003, Wet

20   Seal had lost its customer base, suffered 20 straight months of declining store sales

21   and had five straight quarters of significant losses."  (Pls.' Opp. to Wet Seal Mot. at 6

22   (citing FACC ¶¶ 2, 31).)  They add that Wet Seal had internal reports showing the

23   financial drain from 50 underperforming stores.  (Pls.' Opp. to Wet Seal Mot. at 6

24   (citing FACC ¶¶ 33, 96-98).)  Even in their opposing papers, therefore, Plaintiffs

25   cannot state the necessary *facts*.  They simply reiterate: "Faced with the decision to

26   reveal a true financial picture, threatening its needed financing, Wet Seal elected to

27   delay taking the required charges and instead misled investors about the turnaround

28   of its business."  (Pls.' Opp. to Wet Seal Mot. at 6 (citing FACC ¶ 33).)  This

1   conclusory allegation falls well short of the particularity required by the PSLRA.  In

2   short, Plaintiffs simply do not provide enough information about the allegedly

3   underperforming stores – even in light of their other allegations of Wet Seal's

4   weakened position – to lead reasonably to the inference that GAAP was violated.

5        Not surprisingly, other courts have rejected claims similar to those presented

6   here.  DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990) (dismissing claim

7   that an alleged delay in writing down a loan violated GAAP); In re ICN Pharms., Inc.,

8   299 F. Supp. 2d 1055, 1065 (C.D. Cal. 2004) ("ICN") ("even a delinquent write-down

9   of the impaired assets, without anything more, does not state a claim of securities

10  fraud, *stating at best a bad business decision*" (emphasis added)); Wenger v.

11  Lumisys, Inc., 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998) ("[d]isclosure of accurate

12  historical data does not become misleading even if less favorable results might be

13  predictable by the company in the future"); see also Santa Fe Indus., Inc. v. Green,

14  430 U.S. 462, 477 (1977) (stating that not all instances of "corporate

15  mismanagement" fall within the purview of Section 10(b)).  Based on this authority,

16  and the defects noted above, the Court concludes that Plaintiffs have failed

17  adequately to plead a falsity in the form of a GAAP violation.

18       **b. Even if Plaintiffs Had Adequately Alleged GAAP Violations,**

19       **Plaintiffs Have Failed Adequately to Allege Scienter as to GAAP**

20       Moreover, even if the FACC had alleged falsity in the form of a GAAP

21  violation, it would nonetheless fail for lack of scienter.  While it is true that "[v]iolations

22  of GAAP standards can also provide evidence of scienter," Daou, 397 F.3d at 712,

23       the mere publication of inaccurate accounting figures, or a failure to

24       follow GAAP, without more, does not establish scienter.  Rather, . . .

25       [t]he plaintiff must prove that the accounting practices were so deficient

26       that the audit amounted to no audit at all, or an egregious refusal to see

27       the obvious, or to investigate the doubtful, or that the accounting

28

1   judgments which were made were such that no reasonable accountant

2   would have made the same decisions if confronted with the same facts.

3   DSAM Global Value Fund v. Altris Software, Inc., 288 F.3d 385, 390 (9th Cir. 2002)

4   (citation omitted); see also In re U.S. Aggregates, Inc. Secs. Litig., 235 F. Supp. 2d

5   1063, 1073 (N.D. Cal. 2002) ("U.S. Aggregates") (referring to DSAM for the

6   proposition that "even an obvious failure to follow GAAP does not [without more] give

7   rise to an inference of scienter").  Indeed, even **deliberate** GAAP violations do not by

8   themselves establish scienter.  In re Nuko Info. Sys., Inc. Secs. Litig., 199 F.R.D. 338,

9   344 (N.D. Cal. 2000) (citing WOW, 35 F.3d 1407, 1426 (9th Cir.1994); Hockey v.

10   Medhekar, 30 F. Supp. 2d 1209, 1224 (N.D. Cal. 1998)).

11   Here, Plaintiffs fail adequately to plead facts giving rise to the requisite strong

12   inference of scienter because: (1) they do not allege that any individual Defendant

13   knew or was reckless in disregard of the GAAP violations; and (2) they attribute

14   fraudulent motives to Defendants that are at best implausible.

15   ### *i. The FACC Does Not Adequately Allege Individual*

16   ### *Knowledge or Reckless Disregard of GAAP Violations*

17   The FACC's first defect is that it, like the CAC, lacks any allegation that

18   individual officers knew that Wet Seal's financial reports or statements were false or

19   misleading because the charges to earnings needed to be taken earlier, or that they

20   were deliberately reckless in connection with the same.  This defect alone is fatal to

21   the GAAP claims, because to adequately allege that Wet Seal's financial statements

22   were fraudulent, Plaintiffs were required to provide details concerning the individual

23   defendants' roles in the alleged accounting fraud.  See In re Pac. Gateway Exch., Inc.

24   Sec. Litig., 169 F. Supp. 2d 1160, 1167 (N.D. Cal. 2001).  Therefore,

25   [u]nlike a case in which the court found sufficient pleading detail,

26   Plaintiffs have failed both to substantiate that Defendants committed a

27   violation of GAAP and have failed to provide detailed evidence of the

28

1   *contemporaneous decision-making behind the alleged accounting*

2   *errors that would combine to show the required scienter.* . . .

3   ICN, 299 F. Supp. 2d at 1065 (emphasis added); cf. Daou, 411 F.3d at 1018, 1023

4   (finding a pleading sufficient where plaintiffs referred to specific evidence that the

5   defendants knew the financials were based on fraudulent accounting and "personally

6   directed" violations of stated accounting policy and GAAP (emphasis added)); In re

7   McKesson Hboc Secs. Litig., 126 F. Supp. 2d 1248, 1272-1273, 1275 (N.D. Cal.

8   2000) ("McKesson") (finding scienter where a defendant "allegedly encouraged

9   improper recognition of contingent, consignment, and fictitious sales, and he resisted

10  . . . initial attempts to regularize accounting procedures"). To the contrary, Plaintiffs

11  have not alleged anything about individual officers' involvement in the alleged

12  improper accounting. (See Officers' Reply at 7.)

13       Nonetheless, Plaintiffs contend they establish scienter because certain issues

14  are of such importance to a company that it would be "patently incredible" to argue

15  that high-level executives did not know about them. While the sheer importance of

16  such issues may *sometimes* give rise to a strong inference of scienter, see, e.g.,

17  America West, 320 F.3d at 943 n.21; see also In re Northpoint Commc'ns Group,

18  Inc., Secs. Litig. & Consol. Cases, 221 F. Supp. 2d 1090, 1104-05 (N.D. Cal. 2002)

19  ("Northpoint"), Plaintiffs have not established that the need to take the accounting

20  charge was one of them. Thus, the failure to allege individual culpability remains

21  fatal.

22       *ii. Plaintiffs' Allegations of Motives to Defraud are*

23       *Unavailing*

24       Similarly insufficient are Plaintiffs' allegations as to potential motives to

25  defraud with improper accounting practices. Plaintiffs' main contention as to motive is

26  that Defendants delayed taking the impairment charge so as to appear more

27  attractive to lenders (from whom they needed to secure a $50 million line of credit)

28  and also to investors (from whom they needed to secure a major private equity

1  placement). (FACC ¶¶ 34, 65-74.) They also allege that Defendant Whitford delayed

2  taking the charge so as to increase the possibility that he would earn a bonus in 2004.

3  However, a variety of facts in the record undercut these theories and make it more

4  plausible that the delay in taking the charge was simply the result of optimism that the

5  2004 back-to-school line would spark a meaningful turnaround.

6                         (a). Wet Seal's Disclosures Make It Unlikely Defendants

7                             Would Have Delayed Closing Stores to Trick Lenders or

8                                 Investors

9       First, Defendants' purported motive of fooling lenders or private equity

10  investors by delaying store closures is sharply undercut by Wet Seal's actual

11  practices, which involved detailed disclosures of the risks associated with

12  underperforming stores. For example, Wet Seal announced the closure of 70 stores

13  (from the Wet Seal division and others) at the beginning of the Class Period **and**

14  **before it obtained the financing which Plaintiffs contend motivated the "refusal"**

15  **to close stores**. (See 12/4/03 Conference Call Tr. at 3 (Ex. 23) (announcing closure

16  of 16 Wet Seal and Arden B. stores in 4Q 2003 and 23 Wet Seal and Arden B stores

17  in 2004); 1/7/04 Press Release (Ex. 9) (announcing closure of 31 Zutopia stores by

18  end of 1Q 2004 or early 2Q 2004); see also Ex. 5.) Wet Seal also plainly warned that

19  closing stores would require it to "write down the carrying value of these impaired

20  assets to realizable value, a non-cash event which would negatively impact our

21  earnings and earnings per share." (2003 Form 10-K Ex. 99.1 at 2 (Ex. 2).)

22       Additionally, the SEC filings referenced in the FACC reflect that Wet Seal in

23  fact considered whether charges were required on a quarterly basis, and warned

24  about possible charges to earnings if Wet Seal's back-to-school season were not

25  successful. For instance, the 12/15/03 10-Q described the importance of the back-to-

26  school season, explained the risks associated with ongoing operating losses, noted

27  the decline in comparable store sales, (3Q 2003 Form 10-Q at 11, 35, 36, 40 (Ex. 4);

28  id., Ex. 99.1 at 2), and stated:

1    In the future, we could decide to close stores or curtail operations that
2    are producing continuing financial losses.  If we do so, we would be
3    required to write down the carrying value of these impaired assets to
4    realizable value, a non-cash event which would negatively impact our
5    earnings and earnings per share.

6  (3Q 2003 Form 10-Q at 37 (Ex. 4); see also 11/20/03 Press Release (Ex. 7); 3/18/04

7  Press Release (Ex. 11).)  The 3/30/04 and 6/10/04 SEC filings contained similar and

8  more extensive disclosures and warnings.  (2003 Form 10-K at 5-7, 11, 13, F-8, F-9

9  (Ex. 2); id., Ex. 99.1 at 1, 2; 1Q 2004 Form 10-Q at 8, 15-16, 25, 26 (Ex. 5); id., Ex.

10  99.1 at 1, 4.)  As another example, for 1Q 2004 (ending May 1, 2004), Wet Seal

11  again reported a loss in its share value and reported the continuing decline in its

12  comparable store sales, warning specifically that it might be required to write down

13  certain assets if losses continued.  (1Q 2004 Form 10-Q at 8-9, 17-18 (Ex. 5).)  Wet

14  Seal also even warned its investors about the possibility of bankruptcy.  (1Q 2004

15  Form 10-Q Exhibit 99.1 at 1 (Ex. 5).)

16         Thus, Wet Seal repeatedly disclosed the risks involved and the possibility that

17  the hoped-for turnaround would never materialize.[4]  In addition, Wet Seal expressly

18  warned about the possibility of an impairment charge if the back-to-school season did

19  not succeed.  As the Ninth Circuit reasoned in an analogous circumstance, the

20  "detailed risk disclosure . . . negates an inference of scienter."  WOW, 35 F 3d at

21  1425.

22  //

23  _____

24  [4] For this reason, Whitford argues that all of Plaintiffs' claims are subject to a truth-on-the-
market defense. "[I]n a fraud on the market case, the defendant's failure to disclose material
25  information may be excused where that information has been made credibly available to the
market by other sources." In re Apple Computer Secs. Litig., 886 F.2d 1109, 1115 (9th Cir.
26  1989). However, because this inquiry involves examining the manner and emphasis with which
information is provided to the market, and because the Court easily concludes that the pleadings
27  are otherwise deficient, the Court does not reach this issue  See Basic Inc. v. Levinson, 485
U.S. 224, 246-49 (1988) (outlining theory); Rubin v. Trimble, No. C-95-4353 (MMC), 1997 WL
28  227956, at *7, *18-*20 (N D. Cal. Apr. 28, 1997) (same, and indicating fact-intensive nature of
inquiry).

**(b).  Plaintiffs Fail to Demonstrate that Whitford Would**

**Have Delayed the Write-off to Increase His Bonus**

In addition to Wet Seal's desire to raise capital and maintain its line of credit, Plaintiffs allege that Defendant Whitford had a motive to delay the charges to improve his prospects for a bonus based on Wet Seal's earnings per share.  But Whitford argues persuasively that because he did not receive a bonus for FY 2003 ending January 31, 2004, knowingly deferring a needed impairment charge beyond that date would have virtually ensured that he would *also* not receive a bonus for FY 2004, so he would have in fact been motivated to take it earlier.  Thus, because Plaintiffs have not alleged facts that would square their motive theory with economic reality, they do not adequately allege fraudulent intent as to Whitford.  E.g., Kalnit v. Eichler, 264 F.3d 131, 140-41 (2d Cir. 2001).

### iii.  The Most Reasonable Inference Derived from
### Defendants' Statements Is Cautious Optimism, Not Fraud

The defects in Plaintiffs' pleadings set forth above mean that the most reasonable inference from the record is that Defendants simply delayed taking the charge hoping that the 2004 back-to-school line would succeed and thereby reverse Wet Seal's declining fortunes.  Several facts bolster this inference.  First, given that the 2004 back-to-school line was released on July 12, 2004 and Wet Seal's SEC disclosures indicate that the impairment existed as of July 31, 2004 (Doyle Decl., Ex. C at 8)), a reasonable inference exists that no impairment was believed to exist at Wet Seal prior to preparation of the quarterly financials for the period ending July 31, 2004, and that when Defendants had time to analyze the early disappointing results of the back-to-school season, the write-downs were quickly taken (on August 19, 2004).  In other words, Plaintiffs simply waited until the back-to-school line hit stores, but when it did not catch fire, Plaintiffs acknowledged the reality that Wet Seal would not recover.  Notably, Plaintiffs do not foreclose this inference by alleging that, had

1  the back-to-school line been successful, the impairment charge would still have been

2  needed.

3       In addition, this is not a case where Defendants used fraudulent accounting to

4  portray a failing company as a profitable one.  Even accepting Plaintiffs' allegations as

5  true, Defendants accurately portrayed Wet Seal as what it was – a struggling

6  company seeking to turn itself around in a very competitive market.  This also cuts

7  against scienter and in favor of optimism.  See PR Diamonds, Inc. v. Chandler, 364

8  F.3d 671, 686 (6th Cir. 2004).

9       Finally, Wet Seal's financial statements – except for 1Q 2004 – were certified

10  by Deloitte, Wet Seal's independent auditors.  (2003 Form 10K at F-2 (Ex. 2).)

11  Deloitte allowed Wet Seal to use its report prepared for the 2003 Form 10K **even**

12  **after** the impairment was announced on August 19, 2004.  (Ex. 23.2 to Wet Seal's

13  Amendment No. 1 to Registration Statement on Form S-3 (Ex. 29).)  Although a clean

14  audit opinion does not rule out a finding of scienter, "a clean audit may be considered

15  in determining whether there is scienter." In re Ramp Networks, Inc. Secs. Litig., 201

16  F. Supp. 2d 1051, 1074 n.6  (N.D. Cal. 2002) ("Ramp").  Therefore, the Court finds

17  that the Deloitte approval weighs against scienter as well.

18       For all of these reasons, the words of another court ring particularly true here:

19       Plaintiffs have provided insufficient factual allegations to support both

20       the extent of knowledge and the inference that the failure to recognize

21       the alleged problems was attributable to fraud, rather than a lack of

22       caution, a lack of solid information, a belief that it was part of the

23       company's grand expansion plans, or a momentary surplus of hubris. . .

24       . Thus, Plaintiffs' allegations do not comprise the kind of 'strong

25       circumstantial evidence' needed to establish that Defendants made

26       false or misleading statements either intentionally or with deliberate

27       recklessness.

28  ICN, 299 F. Supp. 2d at 1065 (citing Guess?, 174 F. Supp. 2d at 1078)   In short,

1    even if Plaintiffs had adequately alleged a violation of GAAP, their failure adequately

2    to plead facts giving rise to a strong inference of scienter for GAAP violations – and in

3    fact the dearth of information on how Wet Seal's accounting decisions were made –

4    defeats Plaintiffs' Section 10(b) claim on this basis.

5        **2. PLAINTIFFS FAIL ADEQUATELY TO ALLEGE ANY OTHER MISLEADING**

6        **STATEMENTS BY DECKOP, HAIMS, WHITFORD, AND WET SEAL**

7           In addition to falsity in the form of GAAP violations, Plaintiffs contend

8    Defendants Deckop, Haims, and Whitford (and hence Wet Seal) made a variety of

9    other actionable misrepresentations in their comments to the market, each of which

10   essentially involve optimistic statements about Wet Seal's turnaround plan and the

11   2004 back-to-school line.

12          However, many of the purported misrepresentations are inactionable because

13   they amount merely to corporate puffery and fall within PSLRA's safe harbor provision

14   barring any claims based on forward-looking statements that are accompanied by

15   meaningful cautionary language.  Moreover, as discussed below, even where the

16   alleged statements could constitute actionable statements of fact, Plaintiffs fail to

17   specify any information known to particular corporate officers that was inconsistent

18   with any of the statements attributed to them, and it is unreasonable to infer that the

19   officers acted with fraudulent intent simply because they knew the 2004 back-to-

20   school line was important generally to Wet Seal.  Therefore, as with the GAAP

21   allegations, Plaintiffs' claims in this area fail for lack of an actionable

22   misrepresentation as to many of the statements, and for lack of scienter as to all of

23   them.

24       **a. Many of the Statements to Which Plaintiffs Refer Are**

25         **Inactionable**

26          The allegedly misleading statements include:

27          1. Wet Seal on November 20, 2003 issued a press release quoting Whitford

28   as saying, "We are pleased with the continuation of the month-over-month

1    improvement in our sales trends, and are particularly encouraged by the progress we

2    are making in building back to a positive transaction count . . . ."  (FACC ¶ 44(a).)

3          2.  Whitford on November 20, 2003 stated that "I am personally very excited

4    about the fashion [Alfaro] has developed . . . and am looking forward to showing you

5    the new assortment in the stores next year."  (FACC ¶ 44(b).)

6          3.  Whitford on December 4, 2003 stated that Wet Seal stores were

7    "continuing to gain ground . . . putting us on track to meet our sales estimates for

8    December" and emphasizing the "[w]e look forward to finishing out the year by

9    building on the progress we have made thus far and establishing a strong foundation

10   for a more promising year ahead."  (FACC ¶ 44(c).)

11         4.  Whitford on January 8, 2004 assured investors that "the actions . . . during

12   the period position us well for the new year," and added that "[w]e look forward to

13   introducing some promising new merchandising strategies – the full effects of which

14   are expected to materialize in our back-to-school and fall lines."  (FACC ¶ 44(d).)

15         5.  Whitford also assured investors that Wet Seal was "on track to deliver

16   improved financial performance in the fall, in line with our turnaround plan," adding

17   that "[w]e are beginning to see early signs of improvement in the Wet Seal division."

18   (FACC ¶¶ 4, 44(e).)

19         6.  Deckop stated on March 18, 2004 that "we are seeing early signs of

20   improvement in both divisions, but in particular for the Wet Seal division."  (FACC ¶

21   44(f).)

22         7.  Haims stated in a March 18, 2004 conference call that "[t]he early spring

23   merchandise has performed in line with our expectations, and we are now refreshing

24   the stores with a wider assortment. . . .  [New executives who were announced in

25   January 2004] are working closely with their new in-house design team headed by our

26   Creative Director Victor Alfaro.  They are extremely pleased with the energy Victor

27   has brought to the Company and believe he [sic] will be excited as well when you see

28   his collection in the back-to-school period.  I know many of you have expressed an

-29-

1   interest in previewing this collection, and we are currently working on plans to do

2   that." (FACC ¶ 44(f); 3/18/04 Conference Call Tr. at 6 (Ex. 24).)

3       8.  Whitford indicated on May 6, 2004 that "the merchandise designs that I

4   have seen are fresh, are relevant and are unique to Wet Seal . . . ." (FACC ¶ 44(g).)

5       9.  Whitford stated on May 20, 2004 that "[c]onsistent with our turnaround

6   plan, we are not anticipating a significant change in momentum in our business until

7   the third quarter, when we expect to see the full benefits of our new merchandise

8   assortment and all of our planned marketing initiatives." (FACC ¶ 44(h).)

9       10.  Haims was quoted in a July 7, 2004 newspaper article as stating that an

10  "early positive reaction" to the new back-to-school line had him "highly confident"

11  about the upcoming back-to-school season. (FACC ¶ 44(l).)[5]

12      11.  Whitford stated on July 8, 2004 that "[w]e remain confident that the new

13  assortment is a significant improvement on our prior fashion and will deliver a better

14  operating performance in the second half of the year." (FACC ¶ 44(m).)

15      12.  Haims stated in an August 9, 2004 press release that "[w]e believe that

16  our new fall merchandise is both fashion-forward and unique and is receiving positive

17  feedback from our customers.  We will continue to be aggressive in our promotional

18  activity in order to meet the challenge of bringing her back to our stores." (FACC ¶

19  44(n).)

20      As discussed below, the statements above are not actionable both because

21  they amount to mere corporate puffery, and also because (with one exception) they

22  were accompanied by significant cautionary language.

23

24

25  [5] This is the single statement that was not accompanied by cautionary language.  The statement

26  was mentioned in both the CAC and the FACC and, as discussed below, the Court concludes
    that it is mere corporate puffery.  Each other statement included a standard PSLRA Safe Harbor

27  Statement, explaining that the statement contained "forward-looking" statements that involved
    "material risks and uncertainties and are subject to change based on factors beyond the

28  Company's control."  (See, e.g., Ex. 7 at 235 (safe harbor to November 20, 2003 press
    release).)

1            ### i. Mere Corporate Puffery

2            Statements are not actionable if they "are vague and constitute run-of-the-mill

3    corporate optimism on which no reasonable investor would rely."  Copper Mountain,

4    311 F. Supp. 2d at 869.

5            Predictions and forecasts which are not of **the type subject to**

6            **objective verification** are rarely actionable under § 10(b) and Rule

7            10b-5. . . .  An inability to foresee the future does not constitute fraud,

8            because the securities law approach[es] matters from an ex ante

9            perspective.

10   Id. at 868 (citation and quotation marks omitted) (emphasis added).  The same rule

11   applies to statements that "'lack[] a standard against which a reasonable investor

12   could expect them to be pegged.'"  In re Splash Tech. Holdings Secs. Litig., 160 F.

13   Supp. 2d 1059, 1077 (N.D. Cal. 2001) ("Splash") (citations omitted).  "Interpretation of

14   the 'mere puffery' rule has distinguished cases of 'definitive positive projections' from

15   statements projecting 'excellent results,' a 'blowout winner' product, 'significant sales

16   gains,' and '10% to 30% growth rate over the next several years.'"  Id. at 1077 (citation

17   omitted).

18           Other statements that have been rejected by previous courts on this basis

19   include: (1) "[w]e're the leader in a rapidly growing market," "[w]e have the

20   convergence of the health care trends," and "[w]e have an extremely broad product

21   line," Wenger, 2 F. Supp. 2d at 1245; (2) "business couldn't be better," "it's a great

22   time for a company like ours," and "we already have a sizable lead over our

23   competition," Gupta Corp., 900 F. Supp. at 1236; (3) claims of "industry leading"

24   growth, growth that "positions us beautifully," "measurable progress," "continuing

25   improvements," "accomplishments we have achieved," expressions of pride in staff,

26   and "outstanding retail results," In re CornerStone Propane Partners, L.P. Sec. Litig.,

27   355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005) ("CornerStone"); and (4) "strong,"

28   "robust," "well positioned," "solid" and "improved," Splash, 160 F. Supp. 2d at 1077;

1   see also In re Calpine Corp. Secs. Litig., 288 F. Supp. 2d 1054, 1088 (N.D. Cal.

2   2003) ("Calpine").  As one court further explained:

3       Baxter's statements addressing CornerStone's expected resilience in

4       the face of mounting debt similarly qualify as his opinion, or spin, on the

5       partnership's potential to survive its financial slide. . . .  These too are a

6       form of puffery – the kind of booster confidence any reasonable investor

7       would expect from a CEO.

8   CornerStone, 355 F. Supp. 2d at 1087-88 (citation omitted).

9       Thus, cases regularly reject as mere puffery language of the type Plaintiffs

10   here cite as fraudulent misrepresentations.  Accordingly, the Court holds that the

11   statements quoted above are inactionable as corporate puffery, as well as for the

12   reasons set forth below.

13                       ***ii. Safe Harbor***

14       In addition to being puffery, the above statements are protected by the PSLRA

15   safe harbor provision, 15 U.S.C. § 78u-5(c), which precludes liability for forward-

16   looking statements that are identified as such and are accompanied by meaningful

17   cautionary language.  See, e.g., Clorox, 353 F.3d at 1132-33; 15 U.S.C. § 78u-5(c).

18   Whether a statement qualifies for safe harbor protection is a proper inquiry on a

19   motion to dismiss.  Clorox, 353 F.3d at 1132.  It is also acceptable for a safe harbor

20   provision in a press release or conference call to refer to SEC filings that may contain

21   additional and more specific cautionary language.  Id. at 1132-33; 15 U.S.C. §

22   78u-5(c)(2)(B)(I).

23       Here, the PSLRA's safe harbor bars Plaintiffs' claims as to all but one of the

24   statements above because they were forward-looking and accompanied by

25   cautionary language.  Although certain of the challenged statements disclose

26   historical operating results, Plaintiffs neither allege that any of the historical results

27   were incorrect ***nor*** provide any particularized facts showing falsity.  Therefore, these

28

-32-

1    statements are not actionable on this basis and remain best characterized as forward-

2    looking expressions of optimism that fall squarely within the safe-harbor.

3    　　　　Of course, the puffery and safe-harbor statements above are not the only

4    ones attributed to Defendants.  Plaintiffs also contend that Defendants misled

5    investors about the *current* state of Wet Seal's financial turnaround, including the

6    status of the back-to-school line. (FACC ¶¶ 35-56).  However, even if these

7    statements were incorrect, Plaintiffs fail to allege sufficient facts to establish scienter.

8    　　　　　　　　　**b.  Plaintiffs Fail Adequately to Plead Scienter**

9    　　　　To the extent *any* of the statements attributed to Deckop, Haims, Whitford,

10   and Wet Seal amounts to a "misrepresentation," they nonetheless fail to give rise to

11   Rule 10b-5 liability because each allegation, which the Court shall discuss in turn, and

12   even when considered as a whole, fails to establish a strong inference of scienter.  In

13   other words, Plaintiffs have again failed to plead with adequate particularity that the

14   statements were most likely false and known to be such.  Moreover, strongly weighing

15   *against* scienter is Plaintiffs' failure to indicate how Deckop, Haims, or Whitford would

16   benefit personally from the alleged scheme.

17   　　　　　　　　　　　*i.  Plaintiffs' Allegations*

18   　　　　　　　　　(1).  Introduction of an Out-of-Date Zutopia Line

19   　　　　The Court begins with Plaintiffs' new allegation that Defendants' statements of

20   optimism and of the current status of the turnaround plan were false and known to be

21   so because Wet Seal "did not implement a 'new' Alfaro line, but instead introduced an

22   out-of-date Zutopia line that had previously failed." (FACC ¶ 45(a).)  This allegation

23   rests on Plaintiffs' claim concerning a February 5, 2004 internal "Concept" show for

24   the 2004 back-to-school line, through which Wet Seal buyers could ensure their

25   purchases would fit the "overall feeling" of the line. (FACC ¶ 49.)  Plaintiffs allege that

26   Alfaro failed to design his back-to-school line in time for this show, and that "'two

27   days' before the Concept show was scheduled, a former designer for Zutopia was

28   tasked with coming up with the fall 2004 back-to-school line." (Id. ¶¶ 50-51.)

1  Plaintiffs allege that "the line demonstrated at the Concept show in early February

2  2004 represented a knock-off of a prior failed Zutopia line." (Id. ¶ 50.) Plaintiffs argue

3  that these facts are contrary to Defendants' statements that Alfaro would bring a

4  "fresh new look" to Wet Seal's product line. (Id.) Plaintiffs argue that, accordingly,

5  statements by Deckop, Haims, and Whitford exuding faith in the back-to-school line

6  were most likely false and known to be so because these Defendants knew that the

7  "new" back-to-school line was not an Alfaro design, but instead was merely a copy.

8  (Id. ¶ 51.)[6]

9        The Court disagrees for several reasons.  First, while the allegations above

10  are purportedly drawn from an unidentified former Wet Seal buyer and an unidentified

11  former Wet Seal planner (id. ¶ 50), the FACC does not satisfy the Ninth Circuit's

12  standards for allegations based on statements of unidentified informants.  The Ninth

13  Circuit has accepted that though plaintiffs need not *name* their confidential sources,

14          personal sources of information relied upon in a complaint should be

15          described in the complaint with sufficient particularity to support the

16          probability that a person in the position occupied by the source would

17          possess the information alleged.

18  Daou, 411 F.3d at 1015 (citations and quotation marks omitted).  In addition, the

19  complaint must contain "adequate corroborating details" to support the inference that

20  the defendants' statements were false. Daou, 411 F.3d at 1015-16 (quoting Nursing

21

22

23

---

24  [6] Wet Seal challenges these allegations based on their purported inconsistency with the CAC

25  which, based on Plaintiffs' "reliable and extensive investigation," (CAC ¶ 4), asserted that *Alfaro*
    designed the 2004 back-to-school line.  (E.g., CAC ¶¶ 16, 91, 123, 159.)  Defendants are

26  correct that Plaintiffs may not allege facts which are inconsistent with the CAC's allegations
    because "[a]lthough leave to amend should be liberally granted, the amended complaint may

27  only allege 'other facts consistent with the challenged pleading.'" Reddy v. Litton Indus., 912
    F.2d 291, 296-97 (9th Cir 1990) (citation omitted).  However, although the CAC referred to

28  "Alfaro's line" failing, this is not necessarily inconsistent with the current allegation that one
    problem with the line was that Alfaro did not design all of it.

1  Home Pension Fund, Local 144 v. Oracle Corp., 380 F.3d 1226, 1233 (9th Cir. 2004)

2  ("Nursing Home"); Silicon Graphics, 183 F.3d at 985).[7]

3       Here, Plaintiffs do not allege the informants' job duties or plead any facts

4  explaining how they would have been privy to the design process for the back-to-

5  school line.  Instead, Plaintiffs merely allege the individuals' job titles (a former Wet

6  Seal buyer and a former Wet Seal planner) and allege that both had previously

7  worked at Zutopia and were working at Wet Seal at the time of the Concept Show.

8  (Pls.' Opp. to Wet Seal Mot. at 19 (citing FACC ¶ 50).)  This is insufficient.  Notably

9  absent is any allegation why a "buyer" or "planner" would have knowledge of the

10 *design* process at Wet Seal, or that the informants had any responsibility for the

11 2004 back-to-school line.  The Court simply cannot infer that these job titles inherently

12 conferred such expertise, particularly because the witnesses purport to recount facts

13 apparently invisible even to seasoned market analysts.  Moreover, the job titles of the

14 "buyer" and "planner" do not provide anywhere near the "large degree of specificity"

15 that the Ninth Circuit found sufficient in Daou.  411 F.3d at 1016 (plaintiffs

16 "number[ed] each witness and describe[d] his or her job description and

17 responsibilities," and "[i]n some instances . . . provide[d] the witnesses' exact title and

18 to which Daou executive the witness reported"); see also McKesson, 126 F. Supp. 2d

19 at 1271-72 (finding allegations sufficient from a former product manager and a former

20 regional sales vice president, but noting that such allegations "should be considered

21 by the court with due consideration of their reliability and specificity").

22       Even more problematic, the FACC does not allege that any particular

23 individual Defendant knew that the 2004 back-to-school was a knock-off of a failed

24

25 [7] Defendants invite the Court to apply the standard recently articulated by the Seventh Circuit,
   which holds that "allegations from 'confidential witnesses' must be 'discounted'" and that,
26 "[u]sually that discount will be steep."  Higginbotham v. Baxter Int'l, Inc., — F.3d —, 2007 WL
   2142298, at *3 (7th Cir. June 21, 2007).  The Court declines to do so.  To the extent that
27 Higginbotham states a more sweeping rule than articulated in Ninth Circuit case law, the Court
   is duty bound to apply circuit law unless an intervening Supreme Court decision has enunciated
28 a rule clearly irreconcilable with circuit precedent.  Miller v. Gammie, 335 F.3d 889, 900 (9th
   Cir.2003) (en banc).  No Supreme Court decision has articulated such a rule.

1    Zutopia line.  Rather, Plaintiffs argue that Defendants' knowledge can be inferred

2    given the importance of the new line to Wet Seal's turnaround plan. (Pls.' Opp. to

3    Wet Seal Mot. at 20 (citing FACC ¶¶ 4, 44(a)-(n)).)  Again, the Court disagrees.

4    Although (as noted above) certain issues may be of such importance to a company

5    that it would be "patently incredible" to argue that high-level executives did not know

6    about them, see, e.g., America West, 320 F.3d at 943 n.21; Northpoint, 221 F. Supp.

7    2d at 1104, Plaintiffs have failed to plead facts that would explain why the existence

8    of a knock-off line rose to this level.  To emphasize, the *importance* of the 2004 line

9    to the turnaround is not the question here.  Even given that the line was important,

10   knowing the *details* of Alfaro's designs is a separate matter, and Plaintiffs plead no

11   facts to indicate that Defendants' market expertise would enable them to spot a

12   knock-off when analysts apparently could not.

13         The absence of such facts, combined with the paucity of the pleading

14   concerning the unidentified witnesses, compels the conclusion that the allegations

15   concerning an out-of-date Zutopia line do not weigh in favor of scienter.

16                       (2).  Acquisition of Portions of the Line on the Open

17                       Market

18         The FACC also alleges that "defendants" knew the back-to-school line would

19   fail because Haims admitted that Wet Seal acquired up to 50% of the line on the open

20   market, and therefore that the optimistic statements of Wet Seal, Deckop, Haims, and

21   Whitford were knowingly misleading.  (FACC ¶ 45(b).)  Plaintiffs allege that, according

22   to a former Wet Seal employee, Haims noted in June 2004 that Wet Seal had

23   acquired as much as 50% of the back-to-school line on the open market instead of

24   designing it in-house through Alfaro.  (Id. ¶ 51).)

25         However, Wet Seal's annual report accompanying the 10-K for the period

26   ending January 31, 2004 stated that in 2003 only 20% of Wet Seal's merchandise

27   was designed in-house, and that its ultimate goal entering 2004 was to increase that

28   percentage to 65%.  (Neville Decl., Ex. 6 at 2-3.)  The 10-Q for the period ending May

1  1, 2004 stated that the fall line would be a shift to a larger percentage of in-house

2  designed merchandise. (Ex. 5 at 16.) Therefore, the industry was on notice that Wet

3  Seal was using a mix of in-house design and garments purchased on the open

4  market, and if such a situation "guaranteed" failure, the industry would have been

5  alert to it. Moreover, Wet Seal **disclosed** that it would use a combination of products

6  which were designed in-house and products purchased from other sources for the

7  2004 back-to-school line. (E.g., 2003 Form 10K at 3 (Ex. 2); 2003 Form 10K Ex. 99-1

8  at 2 (Ex. 2); 1Q 2004 Form 10Q Ex. 99.1 at 3 (Ex. 5).) Accordingly, the allegation

9  concerning purchases on the open market does not support an inference of scienter –

10  essentially because the information was disclosed to the market and therefore does

11  not make it any more likely that Defendants' statements of optimism were designed to

12  defraud.

13                    (3). Haims's Alleged Interference with Alfaro's Designs

14         Third, the FACC alleges vaguely that Haims "interfered" with Alfaro's work,

15  which Plaintiffs claim showed a lack of confidence in Alfaro's designs (FACC ¶ 45(g))

16  and therefore contradicted Defendants' stated optimism. This allegation adds little.

17  Plaintiffs offer no specific facts describing the interference, nor do they say how their

18  confidential, unidentified sources would have known whether Haims was interfering or

19  why Alfaro was absent from work for certain periods of time. Moreover, Wet Seal

20  notified the market that Haims would work with Alfaro (because Haims was the

21  president of the Wet Seal division in which Alfaro worked), and **disclosed** that the

22  two "have not demonstrated their ability to work together effectively." (E.g., 3Q 2003

23  Form 10Q at 39 (Ex. 4); 2003 Form 10K Ex. 99.1 at 3 (Ex. 2).)

24         The Ninth Circuit has rejected similar claims. See Vantive, 283 F.3d at 1087

25  (noting the complaint did not indicate what it meant for a management team to be

26  "extremely strong" or why disagreements between managers would make it

27  misleading for the company to have characterized its management as being "strong").

28  Moreover, it is well settled that "[t]o satisfy the statutory requirement that Plaintiffs

-37-

1   plead all facts with particularity, Plaintiffs must provide a list of **all relevant**

2   **circumstances in great detail**." <u>Syncor</u>, 327 F. Supp. 2d at 1157 (citing <u>Silicon</u>

3   <u>Graphics</u>, 183 F.3d at 984. Plaintiffs have failed to provide the relevant

4   circumstances of "interference" here, and therefore the bare allegations do not weigh

5   in favor of scienter.

(4). Sales to Jobbers

7         Next, the FACC repeats the CAC's allegations that in June 2004, Wet Seal

8   had sold "parts of its 2004 back-to-school line to jobbers because they had 'flopped.'"

9   (CAC ¶ 100; FACC ¶ 54.) Again, this allegation is based on a reference in a June 26,

10  2004 newspaper article to an alleged analyst report, which article also noted that Wet

11  Seal denied the report's assertions. (CAC ¶ 100; FACC ¶ 54.) The jobber allegation

12  is allegedly confirmed by "a reputable source associated with Wachovia Securities"

13  and "a former Wet Seal manager who was responsible for purchasing at Wet Seal

14  throughout the Class Period." (FACC ¶ 54.)

15        These allegations do Plaintiffs little good because they provide no specific

16  facts to corroborate the reliability of the report, nor is the reliability corroborated by the

17  fact it was referenced in the newspaper. As one court noted,

18        [N]ewspaper articles should be credited only to the extent that other

19        factual allegations would be – if they are sufficiently particular and

20        detailed to indicate their reliability. Conclusory allegations of

21        wrongdoing are no more sufficient if they come from a newspaper article

22        than from plaintiff's counsel. . . .

23  <u>McKesson</u>, 126 F. Supp. 2d at 1272 (citation omitted).

24        Moreover, the FACC does not specify how the "reputable source" or former

25  purchasing manager knew about Wet Seal's sales to jobbers, nor does it provide

26  information on the garments sold or dates that would corroborate the confidential

27  sources' statements. Nor are there allegations that any particular Defendant knew of

28  any information that would have contradicted Wet Seal's published denial or any

-38-

1   other indication that it would be "patently incredible" for an officer not to know.  See

2   America West, 320 F.3d at 942-43.

3        Moreover, the Court agrees with Whitford that the allegation of sales to

4   jobbers, even if true, is equally inconsistent with plausible inferences contrary to those

5   asserted by Plaintiffs.  (Whitford Reply at 9.)  As Whitford points out:

6        Ordering is never an exact science, and sometimes it can be easier to

7        sell unmatched accessories piecemeal than to keep them in stock while

8        awaiting matching pieces.  For example, if certain blouses are received

9        and it turns out that the matching skirts and handbags will not be

10       available until much later, it might make more economic sense to sell

11       the blouses rather than storing them while waiting for the skirts and

12       handbags.  Thousands of similar scenarios are equally plausible.

13  (Id.)

14       Thus, the Court holds that Plaintiffs fail adequately to develop the sales to

15  jobbers as evidence of scienter at all, let alone adequately explain why they would

16  create the requisite **strong inference** of scienter.  Therefore, the jobber allegation

17  does not advance Plaintiffs' case.

18                    (5).  Ordering Insufficient Product

19       Next, Plaintiffs allege that a former "high-level officer" with Wet Seal stated

20  that the company had ordered only about 65% of the inventory it needed to meet its

21  projected sales for the 2004 back-to-school line.  (FACC ¶ 45(d).)  They also allege

22  that a former district director of Wet Seal "confirmed" that his district did not receive

23  enough inventory to keep stores stocked between August and December 2004.  (Id.)

24       These allegations are unhelpful on a variety of levels.  Plaintiffs do not allege

25  that the "high-level officer" would be in a position to know the relevant information,

26  which alone defeats the utility of his allegations.  See, e.g., Adecco, 371 F. Supp. 2d

27  at  1211 (rejecting allegations from "one former executive").  Moreover, as Whitford

28  notes (Whitford Reply at 9), Plaintiffs provide no information regarding the custom

-39-

1    and practice, either at Wet Seal or the industry in general, as to what percentage of

2    projected sales are ordered in advance, or how far in advance. Therefore, even if

3    Wet Seal did only place orders for 65% of its inventory, it would not necessarily be

4    because of a belief that the line would fail, and would be more consistent with a

5    prudent business practice of assessing sales of the line before further exposing Wet

6    Seal to sunken costs.

7           With respect to the former district director, Plaintiffs not only fail to allege any

8    specific facts such as the types of goods that were understocked or the amount of the

9    shortfall, either of which might serve as useful corroboration, but also do not allege

10   that this understocking was a result of Wet Seal's failure to order enough goods, as

11   opposed to greater-than-expected purchases of the goods in the district or poor

12   allocation of goods among districts. Nor do Plaintiffs provide any indication that the

13   understocking necessarily occurred during the Class Period (which ended in August

14   2004).

15          For all of these reasons, these allegations do not provide the requisite

16   "adequate corroborating details" to comport with the heightened pleading standard.

17   E.g., Daou, 411 F.3d at 1015.

18                          (6). Inability to Recapture the Customer Base

19          Plaintiffs also allege, as they did in the CAC, that Wet Seal knew that it could

20   not recapture its customer base. (CAC ¶ 113(a); FACC ¶ 45(e).) Also as they did in

21   the CAC, Plaintiffs base this allegation on Whitford's statement (after the Class

22   Period ended) that "[t]he business has been in decline for such a long period of time

23   that Wet Seal has lost its customer base." (FACC ¶ 62.) Wet Seal contends

24   persuasively that this was Whitford's attempt to explain what had gone wrong, not a

25   "confession" that Whitford knew beforehand that Wet Seal could not recapture its

26   customer base. Consistent with Defendants' interpretation, in the same conference

27   call in which he made this statement, Whitford also said that he still believed Wet

28   Seal could get its core customers back. (8/19/04 Conference Call Tr. at 10 (Ex. 27).)

1    Therefore, Defendants' reading of Whitford's comment is eminently more reasonable

2    than Plaintiffs', and no strong inference of scienter arises on this basis.

3                        (7).  Motive to Secure Financing

4          Next, the FACC repeats the CAC's allegation that Wet Seal's need to secure

5    financing motivated Wet Seal to issue misleading statements.  (CAC ¶¶ 162-66;

6    FACC ¶¶ 33, 65-72.)  Although "a desire to raise company financing can be probative

7    of a motive to defraud investors," such allegations are insufficient by themselves to

8    establish a strong inference of scienter.  Vantive, 283 F.3d at 1097; see also Silicon

9    Graphics, 183 F.3d at 974 ("In order to show a strong inference of deliberate

10   recklessness, plaintiffs must state facts that come closer to demonstrating intent, as

11   opposed to mere motive and opportunity.").  As another court indicated, "allegations

12   of a motive to present better financial statements to secure credit or to engage in

13   similar business activities are insufficient to establish a strong inference of scienter."

14   Calpine, 288 F. Supp. 2d at 1087 (citing Lipton v. Pathogenesis Corp., 284 F.3d

15   1027, 1038 (9th Cir. 2002); Vantive, 283 F.3d at 1097.  The need for this rule is

16   obvious.  As the court in Lipton explained:

17          If scienter could be pleaded merely by alleging that officers and

18          directors possess motive and opportunity to enhance a company's

19          business prospects, "virtually every company in the United States that

20          experiences a downturn in stock price could be forced to defend

21          securities fraud actions.". . . [Defendant's] alleged desires to obtain

22          favorable financing and to expand abroad are in themselves ordinary

23          and appropriate corporate objectives.  *Such routine business*

24          *objectives, without more, cannot normally be alleged to be*

25          *motivations for fraud*.

26   284 F.3d 1027 (quoting Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d Cir. 1995))

27   (emphasis added); see also Vantive, 283 F.3d at 1097; see also Silicon Graphics,

28   183 F.3d at 974.  Because the motive to secure financing is a normal business

1   objective, and therefore, pursuant to the authority above, it cannot by itself establish

2   scienter.  Moreover, Plaintiffs have provided no explanation why sophisticated lenders

3   and investors would not be able to distinguish between stores that remained open

4   and were draining profits and stores that had actually been closed.  In short, Plaintiffs

5   have again failed to establish that their motive allegation comports with economic

6   reason.  As a result, the Court concludes that it does not weigh in favor of a finding of

7   scienter here.

8                                    (8).  Position at the Company

9          Likewise, the officers' positions at Wet Seal do not themselves establish

10   scienter.  Courts have regularly declined to find a strong inference of scienter based

11   on allegations that a particular defendant "must have known" of information

12   contradicting allegedly false statements because of that individuals' position at the

13   company.  See, e.g., Copper Mountain, 311 F. Supp. 2d at 872 (citing Silicon

14   Graphics, 183 F.3d at 985); Syncor, 327 F. Supp. 2d at 1163 ("Although the Court

15   considers the defendants' positions in the company as one factor in determining

16   scienter [on a motion to dismiss], their positions cannot be the sole basis of such a

17   finding."); Adecco, 371 F. Supp. 2d at 1218-19.  The reason for these holdings is that

18   a presumption about the officers' knowledge "reduces pleading scienter to boilerplate

19   assertions, which would defeat the PSLRA's requirement that scienter be pled with

20   particularity."  Copper Mountain, 311 F. Supp. 2d at 872 (citations omitted)

21   ("declin[ing] to speculate" on the officers' knowledge based on the positions they

22   held).

23          While allegations dealing with position and job duties may support a

24   "reasonable inference" of scienter, therefore, they do not meet the PSLRA's **strong**

25   inference requirement in this Circuit.  See Read-Rite, 335 F.3d at 848-49.  And as

26   noted repeatedly above, Defendants have not shown that the **precise status of the**

27   **design** of the back-to-school line was an issue which it is "patently incredible" to

28

                                        -42-

1  believe that Defendants did not know about, see America West, 320 F.3d at 942-43,

2  even though the line itself was certainly important.

3       Therefore, contrary to Plaintiffs' suggestion, Defendants' job titles alone do not

4  provide a strong inference of scienter.

5                        (9).  Real Time Reporting

6       Plaintiffs again claim that Defendants' access to real time reports, which

7  supposedly showed Wet Seal's deteriorating financial condition, supports their claims.

8  (See CAC ¶¶ 126-35; FACC ¶¶ 86-95.)  Again, however, these allegations are

9  insufficient because Plaintiffs have not alleged any specific data that the individual

10  Defendants learned from these reports that were inconsistent with Wet Seal's public

11  statements.  (Wet Seal Mot. at 24.)  This is insufficient under controlling Ninth Circuit

12  precedent.  As the Ninth Circuit has reasoned:

13       [I]f a plaintiff is to rely on the existence of reports as a means of

14       establishing knowledge, she must include adequate corroborating

15       details, such as the sources of her information with respect to the

16       reports, how she learned of the reports, who drafted them, . . . which

17       officers received them, and an adequate description of their contents. . .

18       . The reason for requiring such detail was that every sophisticated

19       corporation uses some kind of internal reporting system reflecting earlier

20       forecasts, and that allowing a plaintiff to go forward with a case based

21       on general allegations of negative internal reports would expose all

22       those companies to securities litigation whenever their stock prices

23       dropped. . . .

24  Vantive, 283 F.3d at 1087-88 (citations and quotation marks omitted); see also

25  Nursing Home, 380 F.3d at 1231; Silicon Graphics, 183 F.3d at 985; Adecco, 371 F.

26  Supp. 2d at 1218-19 ("The Complaint does not, however, describe how or when any

27  of the individual Defendants received these reports, how the individual Defendants

28  knew the reports contained false information, or the sources of Plaintiffs' information

1   regarding these reports. ***The absence of these allegations belies a strong***

2   ***inference of scienter***." (emphasis added)).

3        Moreover, mere access to contradictory information, even combined with

4   allegations of a hands-on management style, is not enough to show deliberate

5   recklessness. See In re Apple Computer, Inc., Secs. Litig., 243 F. Supp. 2d 1012,

6   1026, 1028 (N.D Cal. 2002); Lipton, 284 F.3d at 1035-36. But that is essentially all

7   that Plaintiffs allege here. To emphasize, Plaintiffs do not indicate how the supposed

8   "real time" data was inconsistent with anything that the officers said, aside from the

9   general contention that the officers would have known the line would fail. (Officers'

10  Mot. at 5.) Accordingly, this allegation similarly fails to weigh in favor of a strong

11  inference of scienter.

12                    (10).  Disastrous Reviews, Failing to Meet Expectations in

13                    May, and Other Conclusory Allegations

14       The FACC also includes a barrage of conclusory allegations concerning Wet

15  Seal's financial status, each of which fails to support scienter for fairly obvious

16  reasons. First, the FACC repeats the CAC's allegation that the 2004 back-to-school

17  line received "disastrous reviews," (CAC ¶ 113(c); FACC ¶ 45(f)), but fails to identify

18  any such review even in opposition to the motions to dismiss. Likewise, the FACC

19  does not describe the "disastrous" reviews with any specificity. To the contrary,

20  moreover, Defendants point to various reviews that describe the back-to-school line

21  favorably. (Exs. 18, 20, 21, 22.) Plaintiffs' allegation also fails to account for why the

22  analysts positively previewed the line or why Alfaro, if he was indeed not the designer

23  of the line, subsequently made a public appearance to tout it. (See Whitford Mot. at

24  8; Neville Decl., Ex. 9.)

25       Plaintiffs also allege that portions of the 2004 back-to-school line entered

26  stores as early as May 2004 and "failed to meet expectations." (FACC ¶ 45(h).)

27  However, Plaintiffs neither allege any facts to support this contention nor explain what

28  actions Defendants should have taken as a result.

1    The only additional motive allegations leveled at each of the Officer

2    Defendants are: (1) descriptions of May 2003 and January 2004 amendments to the

3    credit line, which, along with the May 2004 amendment described in the CAC,

4    supposedly indicated concerns about Wet Seal's liquidity (FACC ¶¶ 66-68); and (2)

5    an allegation that Wet Seal violated the credit agreement by failing to take the

6    impairment charge earlier (FACC ¶ 69.)  Neither addition helps Plaintiffs and in fact,

7    the amendments, which were described and attached to Wet Seal's securities filings,

8    (e.g., 2003 Form 10K, Ex. 10.3.3 (Ex. 2)), show that the investment community was

9    aware of Wet Seal's deteriorating financial condition.  Likewise, Plaintiffs do not

10   explain the importance of the credit agreement or why Wet Seal waited until June

11   2004 to secure the financing instead of doing so at the beginning of the Class Period

12   when its stock price and financial condition were **better**.

13   Moreover, Wet Seal's comparable store sales were fully disclosed, which

14   made its downward trend visible to all investors.  (See Longo Decl. ¶ 3; Defs.' Ex. 2 )

15   This disclosure negates an inference of fraudulent intent, as mentioned above.

16   WOW, 35 F.3d at 1425.

17   Accordingly, these allegations likewise do not support a strong inference of

18   scienter.

19                  (11).  Whitford's Compensation Package

20   The only scienter allegation specifically directed at Whitford is that he was

21   "motivated" to delay Wet Seal's compliance with GAAP so that he could receive a

22   year-end bonus for the period ending January 31, 2004.  (FACC ¶ 99.)[8]  The FACC

23   alleges that Whitford's potential yearly bonus was tied to Wet Seal's earnings per

24   share ("EPS") performance for Wet Seal.  (Id. ¶ 99.)  As a result, Whitford allegedly

25   had a "strong incentive" to keep "Wet Seal's EPS inflated," presumably during the

26

27   _____

28   [8]   Differently from the CAC, the FACC does not allege that Whitford was linked to La Senza's
     sale of Wet Seal stock, so the allegations concerning La Senza Defendants' scienter do not
     relate to Whitford.  (See FACC ¶¶ 75-85.)

1   almost three-month period from the commencement of the Class Period on

2   November 20, 2003 to the end of FY 2003 on January 31, 2004, because any such

3   impairment charge "would lower the Company's EPS." (Id.)

4        These allegations are inadequate because they rely on implausible

5   inferences.  First, it strains credulity to believe that Whitford was concerned with his

6   year-end bonus for 2003 when his contemporaneous public statements reflected a

7   hope for a turnaround for Wet Seal that would not occur until the second half of 2004.

8   Moreover, Whitford argues persuasively that, given the allegations in the FACC, his

9   potential entitlement to a bonus based on EPS would have provided him with a

10  *greater* incentive to take a charge to earnings in FY 2003.  If Whitford had believed

11  that the charges should have been taken for FY 2003, his financial self-interest would

12  have motivated him not to accelerate taking the write-down because he would have

13  known by January 2004 that he had no chance to earn a bonus for FY 2003.  Had the

14  charge been taken then, Wet Seal would have entered FY 2004 with a clean slate,

15  which would have increased the chances of Wet Seal meeting EPS levels sufficient to

16  entitle Whitford to a bonus for *FY 2004* (ending January 31, 2005).  In these

17  circumstances, Whitford's bonus structure, which would have encouraged an earlier

18  write-off of certain assets actually *negates* an inference of scienter.

19        In sum, none of Plaintiffs' allegations concerning scienter in this area are pled

20  with sufficient particularity, and therefore Plaintiffs fail to raise the requisite strong

21  inference of scienter.

22        ## *ii.  A Lack of Tangible Personal Benefits from the Scheme*

23             ## *Weighs Against Scienter*

24        In addition to Plaintiffs' failure to plead specific facts showing that the Officers

25  knowingly made false statements, fraud is not the most plausible inference in any

26  event.  Because Plaintiffs do not allege that any officers other than Teitelbaum and

27  Gross (through La Senza) engaged in any insider sales or otherwise benefitted from

28  any allegedly misleading statement, it is unreasonable to infer fraud on the part of the

1   non-La Senza officers.[9]  WOW, 35 F.3d at 1425 ("[T]he Officers' minimal sales of

2   stock also negates an inference of scienter."); Kalnit v. Eichler, 264 F.3d 131, 142 (2d

3   Cir. 2001) (affirming conclusion that district court did not sufficiently allege motive

4   when "plaintiffs have not pointed to any specific benefit that would inure to the

5   defendants that would not be either generalized to all corporate directors or beneficial

6   to all shareholders, not just the defendant directors specifically."); Novak v. Kasaks,

7   216 F.3d 300, 307-08 (2d Cir. 2000) ("[P]laintiffs had to allege that defendants

8   benefitted in some concrete and personal way from the purported fraud.").

9   Accordingly, while allegations of insider sales "are not required" in securities fraud

10   cases, see In re Wells Fargo Secs. Litig., 12 F.3d 922, 931 (9th Cir. 1993); WOW, 35

11   F.3d at 1424-25, the lack of **any** tangible, personal benefit here further weighs against

12   the Officer Defendants having scienter.

13           Accordingly, the Court holds Plaintiffs have failed adequately to plead scienter

14   as to Deckop, Haims, Whitford, and Wet Seal.

15           ### 3. THE ALLEGED STATEMENTS BY TEITELBAUM AND LA SENZA

16           The third and final category of alleged misrepresentation involves statements

17   regarding La Senza's July 2004 sale of its Wet Seal stock.  As the basis for Section

18   10(b) liability against Teitelbaum and La Senza,[10] Plaintiffs point to three statements

19

---

20   [9] Notably, Plaintiffs do not contend that La Senza's sales support an inference of scienter
against any Defendants other than Teitelbaum, Gross, and La Senza, and the other Defendants

21   are not even alleged to have known about La Senza's sales in advance  (See FACC ¶ 76 ) La
Senza's sales may even serve to negate an inference of scienter because the other Defendants

22   did not sell stock  See In re FVC.com Secs. Litig., 136 F. Supp. 2d 1031, 1039 (N.D. Cal. 2000)
("[T]he fact that FVC's President and CEO, who became CEO just prior to the January press

23   releases, did not sell any of his stock (and, accordingly, was not named as a defendant) negates
any slight inference of scienter."), WOW, 35 F.3d at 1425 ("[T]he Officers' minimal sales of

24   stock also negates an inference of scienter") (citing Apple Computer, 886 F.2d at 1117).

25   [10] As noted above, the only "statements" alleged against Gross, who was also an officer of La
Senza, were signatures on Wet Seal's SEC filings. These signatures do count as statements

26   under Section 10(b), but they were allegedly false based upon the GAAP violations described

27   above, which the Court has already concluded were insufficiently pled  Moreover, to the extent
Plaintiffs attempt to attribute statements by Deckop, Haims, and Whitford to Teitelbaum, Gross,

28   and La Senza, their attempt to do so relies upon the "group pleading" doctrine, which was
(continued ..)

1  that provide explanations for La Senza's sale of Wet Seal stock: (1) Teitelbaum on

2  July 16, 2007 saying that the sale "will complete La Senza's strategic transformation

3  process into a pure play as an international lingerie retailer;" (2) La Senza CFO

4  Palestini stating on July 17 that "Wet Seal is not part of our strategy;" and (3)

5  Teitelbaum stating on July 19 (the last of the five days on which La Senza sold its

6  stock) that La Senza's decision "was not a vote of no confidence." (FACC ¶¶ 83-84.)

7  　　　　Of course, Plaintiffs cannot show any of these statements were literally false.

8  Wet Seal is not a lingerie dealer, it was clearly not part of La Senza's strategy after

9  the stock sale, and La Senza is not a house of parliament.[11]  Moreover, Plaintiffs

10  cannot contend that La Senza represented that it was **unconcerned** with Wet Seal's

11  financial status – in the same breath as his "pure play" statement, Teitelbaum

12  disclosed to the market that part of La Senza's motivation for selling the Wet Seal

13  stock was to avoid the negative impact to its balance sheets from "the equity pick up

14  of the Wet Seal operating results." (Longo Decl., Ex. O (emphasis added).)

15

16

[10](...continued)

17  overturned by the PSLRA. Therefore, the Court shall only consider the statements in this
section as they relate to Teitelbaum and La Senza.

18

19  [11] Plaintiffs' attempt to demonstrate that the July 16, 2004 statement was literally false actually
supports the contrary conclusion because the cited evidence reveals that La Senza had

20  articulated its new business objective some months prior to the sale of the Wet Seal stock. In
the Court's view, that corroborates the reasons given for the July 2004 sales. Nevertheless,

21  Plaintiffs claim that because La Senza's 2003 Annual Report, filed May 26, 2004, states that
"having exited the women's wear business, the Company became a 'pure play' lingerie retailer,"

22  (FACC ¶ 82 (emphases added)), its pure-play transition was already complete and could not
have been a factor in the July 2004 sales. Plaintiffs also claim Teitelbaum's statement was false

23  because "nowhere in the 2003 Annual Report or in any other public statement prior to La
Senza's sale did La Senza, Teitelbaum, or Gross suggest that La Senza's investment in Wet

24  Seal is inconsistent with La Senza's long term strategy." (FACC ¶ 82; see also La Senza Defs.'
Mot at 11.) Both arguments take La Senza's statement out of context and ignore the totality

25  of its message. Among other things, La Senza's 2003 Annual Report expressly noted  that La
Senza's transformation was ongoing. (Longo Decl , Ex. M at 7 ("Our goal is to transform La

26  Senza . . . into a 'pure play' . . . .") (emphasis added); see also Longo Decl., Exs. K, L.)
Plaintiffs' argument is based entirely on some imprecision in La Senza's description of the status

27  of its "pure play lingerie" strategy, which included occasional inconsistencies in verb tenses used
to describe whether the strategy was ongoing or complete. But in actuality, the strategy was

28  clearly not complete while La Senza held Wet Seal stock, as there is no allegation or any other
indication that Wet Seal is a lingerie retailer

1    Rather, Plaintiffs essentially contend that the above statements were

2  misleading because they amounted to innocent explanations for something that was

3  not innocent – that is, that they were intended to represent that La Senza was not

4  trading on material non-public information, when in fact it was.  Therefore, to show

5  adequately that these statements were misrepresentations made with scienter,

6  Plaintiffs must allege with particularity that Teitelbaum (and therefore La Senza) in

7  fact did know material, non-public facts concerning Wet Seal's precarious financial

8  condition.

9    Plaintiffs fail to do so.  The only allegations remotely concerning Teitelbaum's

10  (and therefore La Senza's) knowledge are the report from a real estate officer in

11  February 2003 that Wet Seal "needed" to close 50 underperforming stores and the

12  conclusory assertion that Teitelbaum "knew" Wet Seal would soon "have to" record its

13  accounting charge   (FACC ¶¶ 26, 56.)  But the store closure recommendation is not

14  a fact; it is the subjective judgment of the speaker.  Because Plaintiffs fail to state the

15  *underlying* facts that indicated *why* the stores purportedly needed to be closed, they

16  fail to plead with particularity that explanations for La Senza's sales were intentional

17  misrepresentations – they provide nothing to suggest that the real estate officer's

18  recommendation should have been persuasive to Teitelbaum, let alone any

19  corroborating details that would have indicated to him that the store closures were

20  inevitable.  E.g., Daou, 411 F.3d at 1015 (plaintiff must describe confidential

21  witnesses with sufficient particularity *and* must provide adequate corroborating

22  details); see also Higginbotham, 2007 WL 2142298, at *10-11 (rejecting plaintiff's

23  suggestion that government accusations of corporate wrongdoing meant defendants

24  necessarily knew or were reckless with disregard to actual wrongdoing).  Moreover,

25  because Plaintiffs do not explain the circumstances conveyed to Teitelbaum, they

26  have not adequately alleged that the underlying information was non-public, which is

27  crucial to demonstrate that the innocent explanations were in fact false.  And to the

28  extent Plaintiffs contend the recommendation itself was a relevant non-public fact,

-49-

1    Plaintiffs' failure to recount the factual basis for the recommendation meant they have
2    failed adequately to allege it was material.
3           Similarly inadequate is the allegation that Wet Seal would "have to" record the
4    accounting charge.  Notably, Plaintiffs do not allege that Teitelbaum knew the
5    decision to record the charge had already been made, or even that he himself
6    eventually made the decision.  Nor do they allege with particularity any underlying
7    facts that would have indicated to Teitelbaum – but not the public – that the charge
8    would inevitably be taken.  Without such allegations, Plaintiffs are essentially left with
9    the claim that Teitelbaum could predict the future – that Wet Seal would close the
10   stores and take the charge.  The PSLRA requires more.
11          Plaintiffs' likewise fail to identify any other material, non-public information that
12   would support the alleged falsity of the statements made by Teitelbaum and La
13   Senza.  For example, their opposing papers point to the allegations that the Alfaro
14   line was an unsuccessful combination of failed Zutopia and open-market designs that
15   had to be sold to jobbers, as well as Teitelbaum's access to real-time daily sales
16   reports.   (Opp. La Senza at 6-7 (citing FACC ¶¶ 50).)  As indicated above, however,
17   these allegations are too conclusory to meet the PLSRA's requirements.  The Zutopia
18   allegation rests on the accounts of unidentified informants that do not meet the Ninth
19   Circuit's standard for such allegations because they do not include adequate
20   corroborating details (and indeed include little more than the informants' job titles).
21   Moreover, Plaintiffs do not explain how Teitelbaum would have detected the knockoff
22   line when market analysts apparently could not have.  Nor do Plaintiffs explain how
23   acquisitions of the line from the open market could constitute material, non-public
24   information when Wet Seal *repeatedly disclosed* that it used a mix of in-house and
25   open market designs.  Similarly, Plaintiffs fail adequately to corroborate the reports of
26   sales to jobbers, nor do they explain why Teitelbaum would necessarily have known
27   of them.
28

1     Finally, as to the sales reports, Plaintiffs provide no indication of any

2     information contained in those reports that was not disclosed to the public.  To

3     emphasize, on July 8, 2004, Wet Seal disclosed the 10.1% decline in its comparable

4     store sales even after the back-to-school line hit the market.  (FACC ¶ 44(m); Defs.'

5     Ex. 14).)  Therefore, to satisfy the PSLRA Plaintiffs would have to point to some

6     information in the daily sales reports between July 8 (the date of the disclosure) and

7     July 13 (when La Senza began to sell) that would constitute material, non-public

8     information.  But they do not.[12]

9          For the foregoing reasons, Plaintiffs have failed adequately to plead that

10    Teitelbaum's and La Senza's explanations for the stock sales were

11    misrepresentations.  This infirmity is fatal to their Section 10(b) claims in this area.

12         As a result, each of Plaintiffs' Section 10(b) claims fail as a matter of law.

13    **D.  CLAIMS AGAINST ALL DEFENDANTS PURSUANT TO SECTION 20(A)**

14         Plaintiffs also allege that each Defendant is liable as a control person under

15    Section 20(a) of the 1934 Act, 15 U.S.C. § 78t(a).  (See FACC ¶ 121.)  In the Ninth

16    Circuit, "[i]n order to prove a prima facie case under § 20(a), [a] plaintiff must prove:

17    (1) a primary violation of federal securities laws . . .; and (2) that the defendant

18    exercised actual power or control over the primary violator . . . ."  Howard v. Everex

19    Sys., 228 F.3d 1057, 1065 (9th Cir. 2000) (citation omitted); see also America West,

20    320 F.3d at 945; Syncor, 327 F. Supp. 2d at 1173-74; In re Metawave Commc'ns

21    Corp. Secs. Litig., 298 F. Supp. 2d 1056, 1086 (W.D. Wash. 2003) ("Metawave").

22    Therefore, without a primary violation, there can be no control person liability.  Lipton

23    v. Pathogenesis Corp., 284 F.3d 1027, 1035 n.15 (9th Cir. 2002) ("to prevail on their

24    claims for violations of § 20(a) and § 20A, plaintiffs must first allege a violation of §

25    _____

26    [12] The FACC also alleges vaguely that "Teitelbaum and Gross were highly motivated to dump
      La Senza's Wet Seal holdings before it was publicly revealed that Alfaro was resigning."  (FACC

27    ¶ 83.)  This allegation comes nowhere near to adequately pleading that La Senza had material,
      non-public information in the form of advance knowledge of Alfaro's departure, however.

28    Indeed, nowhere in the FACC is there any allegation that Alfaro in fact resigned before the
      announced date of August 9, 2004.  (See id. ¶ 58.)

1 | 10(b) or Rule 10b 5"). Because Plaintiffs fail adequately to plead a primary violation

2 | here, their control person claim fails as well.

3 | ### E. CLAIMS AGAINST LA SENZA DEFENDANTS PURSUANT TO SECTION 20A

4 | As they did in the CAC, Plaintiffs again assert insider trading claims against

5 | the La Senza Defendants under Section 20A of the 1934 Act, 15 U.S.C. § 78t-1(a),

6 | based on La Senza's July 2004 sales of its Wet Seal stock.  Section 20A, governing

7 | liability to contemporaneous traders for insider trading, provides in relevant part:

8 | Any person who violates any provision of this title . . . or the rules or

9 | regulations thereunder by purchasing or selling a security **while in**

10 | **possession of material, nonpublic information** shall be liable in an

11 | action in any court of competent jurisdiction to any person who,

12 | contemporaneously with the . . . sale of securities that is the subject of

13 | such violation, has purchased . . . securities of the same class

14 | 15 U.S.C. § 78t-1(a) (emphasis added).  Here, however, for the same reasons that

15 | Plaintiffs fail adequately to plead that the innocent explanations for the stock sales

16 | were misrepresentations, they fail adequately to plead that the La Senza Defendants

17 | possessed material, non-public information.  This defeats the insider trading claim,

18 | both for lack of an underlying predicate violation of the 1934 Act, and for lack of

19 | material, non-public information.  See, e.g., Lipton, 284 F.3d at 1035 n.15; Berger v.

20 | Ludwick, Nos. C-97-0728 (CAL), C-97-2347 (CAL), 2000 WL 1262646, at *11 (N.D.

21 | Cal. Aug. 17, 2000) (finding no cause of action for insider selling or Section 20A

22 | liability where plaintiff "still does not allege what inside information was known to

23 | individual defendants").

24 | ### F. LEAVE TO AMEND

25 | All Defendants ask that the FACC be dismissed with prejudice, and Plaintiffs

26 | do not respond to this request in any manner.  Defendants' request has merit.  In the

27 | Ninth Circuit, "[t]he district court's discretion to deny leave to amend is particularly

28 | broad where [the] plaintiff has previously amended the complaint."  Allen v. City of

1  <u>Beverly Hills</u>, 911 F.2d 367, 373 (9th Cir. 1990).  In <u>Vantive</u>, accordingly, the court

2  reasoned on the grounds of futility:

3      When given the opportunity, the plaintiffs declined to say what additional

4      facts they might plead if given the chance to amend.  Such a failure is a

5      strong indication that the plaintiffs have no additional facts to plead.

6      <u>See</u> <u>Silicon Graphics</u>, 183 F.3d at 991 (denying leave to amend where

7      plaintiff failed to offer additional facts which might cure defects in

8      complaint); <u>In re VeriFone Sec Litig.</u>, 11 F.3d 865, 872 (9th Cir. 1993)

9      (same).  There was no abuse of discretion.

10  <u>Vantive</u>, 283 F.3d at 1098 (affirming denial of leave to amend when the plaintiffs had

11  been given three opportunities to amend).

12      Here, the FACC, despite its somewhat misleading title, is the third complaint

13  that has been filed in this action (the initial complaints, which were then consolidated,

14  the CAC, and now the FACC).  This, combined with the fact that Plaintiffs do not

15  request leave to amend or, to that end, indicate that they could allege additional facts,

16  counsels in favor of dismissal.  Based on this reasoning, Plaintiffs shall not be allowed

17  leave to amend here.

18  **IV.**

19  **CONCLUSION**

20      For the reasons set forth herein, Defendants' motions to dismiss are

21  **GRANTED WITHOUT LEAVE TO AMEND** and that Plaintiffs' claims are **DISMISSED**

22  **WITH PREJUDICE.**

23

24      IT IS SO ORDERED.

25

26  DATED: August 28, 2007

27      Judge Gary Allen Feess

28      United States District Court